Renaldo FERRARI, John Orman Knight,
Jack Cherpakov and Lester Dar-
neille, Appellants,

v.

UNITED STATES of America,
Appellee.

No. 15282.

United States Court of Appeals
Ninth Circuit.

May 2, 1957.

Rehearing Denied June 18, 1957.

Harry P. Glassman, San Francisco, Cal., for appellant Ferrari.

B. Michael Lewton, San Francisco, Cal., for appellant Cherpakov.

Lester Darneille and John Orman Knight, in pro. per.

Lloyd H. Burke, U. S. Atty., John Lockley, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before LEMMON, FEE, and CHAMBERS, Circuit Judges.

LEMMON, Circuit Judge.

In a gumshoe and cloak-and-dagger atmosphere, the record in this case discloses the devious machinations of those who traffic in the dried juice of the poppy.

A Federal agent posing as an investment broker, who used a New York gangster as a reference, and who was warned that if he "did wrong by Red" he would "end up in an alley"; 3 a.m. breakfasts in the G-man's apartment, which was wired for sound—with two ladies of San Francisco's night life, endowed with the rhythmic names of "June and Jyrene", as pickup guests; and, finally, during the early hours of an unlucky August 13, delivery of an unlucky thirteen ounces of narcotics in a paper bag holding six rubber containers, in "the fourth drawer down" of a bureau in a motel cabin—these are some of the intriguing details disclosed by the record in this case.

1. *Statement of the Case*

On February 23, 1956, there was returned against the appellants and others an indictment consisting of sixteen counts and fifteen overt acts, and charging violation of the Harrison Narcotic Act (26 U.S.C.A. §§ 4704 and 7237 [1954 Ed.]); the Jones-Miller Act (21 U.S.C.A. § 174); and a conspiracy to violate those acts (18 U.S.C.A. § 371).

All appellants were included among the defendants on the sixteenth count, which charged a conspiracy to violate the other two statutes, supra. In addition, the appellant Darneille was charged with violation of the Harrison Act in Count 1, and with violation of the Jones-Miller Act in Count 2. The remaining thirteen counts related solely to co-defendant Charles Garcia, Sr., who with Charles Garcia, Jr., pleaded guilty to certain of the charges prior to the

commencement of the trial. Charles Garcia, Jr., was named in Counts 1 and 2, together with his father and Darneille.[1]

After a jury trial all the four appellants were found guilty as charged on Count 16. Darneille was also found guilty on Count 1 and not guilty on Count 2.

Each appellant was sentenced to a term of five years' imprisonment and was fined $1 on Count 16. In addition, Darneille was sentenced to five years' imprisonment and was fined $1 on Count 1, his sentences of imprisonment on Counts 1 and 16 to run concurrently. From judgment imposing these sentences, the present appeal has been taken.

### 2. The Appellee's Evidence

After testimony by two chemists for the Treasury Department regarding the seized heroin, Ira Charles Feldman, an agent of the Bureau of Narcotics, testified that he first met the appellant Ferrari in Ciro's Bar, 645 Geary Street, San Francisco, on July 6, 1955, where Ferrari was "tending bar". Feldman told Ferrari that he was "an investment broker from the East", and that he "bought and sold things, small things, something that he could put in [his] pocket, carry around, and turn over for a fast buck."

Ferrari replied that he knew what Feldman wanted, but things were "pretty tight", and that he himself hadn't "been paid in the last two months".

On the evening of July 8, 1955, Feldman was introduced by appellant Ferrari to appellant Knight, who was also behind the bar.

On July 17, 1955, Feldman invited Ferrari to his apartment, saying that he thought they could "make a deal". Ferrari replied that he couldn't make it that evening, but that he was sure that

in a few days he "could come up and he would be very happy to talk". Feldman told Ferrari what he wanted to talk about.

On July 20, 1955, again at Ciro's Bar, Feldman met Ferrari and Knight and invited them to his apartment. Ferrari again said that he "couldn't make it, but [that] Knight could make it. Ferrari departed shortly afterward, but Feldman remained. By prearrangement with Feldman, Janet Jones, alias Janet Howard, a special employee of the Bureau of Narcotics, came up to the bar, and Knight was introduced to her. Since "business was not very good", Knight joined Miss Jones and Feldman in a back booth.

Knight said that he would "be happy" to go up to Feldman's apartment that night, and said that he would like to take his "lady friend" after the bar was closed.

At 2 a.m. on July 21, 1955 Knight closed the bar, and said that he would pick up his "girl". Feldman and Miss Jones went on ahead to Feldman's apartment, and at 2:45 a.m. were joined there by Knight and Marie Hagler, whose surname at first appears erroneously as "Heller".

While the girls were absent from the room, Knight asked Feldman, "What do you want, black or white?" Feldman asked him what he meant, and Knight replied, "Junk".

Feldman testified that "white" meant heroin, and "black" opium, while "junk" stood for the generic term, "narcotics".

Feldman told Knight that he wanted "white stuff". Knight said that one had to be careful in San Francisco, that the "feds" were "all over", and that he would contact Feldman on the following day.

On the evening of July 22, 1955, Feldman met Knight, Ferrari, and "Bones" Darneille, another of the appellants. He also met Dave Miflin, a defendant

---

1. The appellee erroneously states that "The remaining [thirteen] counts of the indictment related to two co-defendants, Charles Garcia, Sr., and Charles Clarence Garcia, Jr.," etc. Garcia, Jr., was not named in Counts 3–15, inclusive. Only Garcia, Sr., was there charged.

who was convicted, but as to whom a motion for acquittal was granted by the trial judge. The disposition of his case does not appear in the record.

This time Ferrari accepted an invitation to go to Feldman's apartment that night, after he closed up the bar. But once again Ferrari failed to show up. After waiting for him at Ciro's until approximately 2 a.m., July 23, 1955, Darneille, Miflin, Feldman, Miss Jones alias Howard, and two females that they picked up en route—who rejoiced in the alliterative names of "June" and "Jyrene"—went to Feldman's apartment.

How Ferrari managed to elude Feldman and his party at Ciro's is not explained.

In the absence of the "ladies", Darneille, Miflin, and Feldman conversed in the living room. Darneille admired Feldman's apartment, and said that after seeing how Feldman lived, he knew what Feldman did. He confessed that at first he hadn't trusted Feldman. He said that he thought they could get together, "and make a couple of grand apiece". Darneille said he wouldn't "move anything less than a pound and mostly kilos".[2]

Feldman told Darneille that on the previous night, he had "made a pitch to a guy about narcotics". Darneille replied: "I know about the pitch * * * Red Knight told me."

On the morning of July 23, 1955, Feldman received a telephone call from Knight, informing him that "Bones" [Darneille] still wanted to see Feldman and deal with him.

On the evening of July 26, 1955 and the morning of July 27, 1955, Feldman and Miss Jones met Darneille at Harold's Rebound Club, on Geary Street, and the three went to Feldman's apartment.

Darneille said that he knew "narcotics backwards and forwards, that he had fooled with narcotics for the last twenty-five years, that he smoked opium for the last fifteen years, and that he had "kicked" the habit "just three years ago". He added:

"Within a few days, Ike, we will have a deal. * * * We will all make some money. * * * There is nothing about junk I don't know."

On the evening of July 27, 1955, at Harold's Rebound Club, which is "approximately cater-cornered from Ciro's" "on Geary Street between Leavenworth and Jones", Darneille introduced appellant Cherpakov to Feldman as "Jack Cherry". Later that night, Cherpakov said to Feldman:

"Ike, you're doing pretty good. You are here only a month and you are scoring already. * * * You can't get any bigger than Red Ferrari. If you do right by Red, you will be O.K. If you do wrong by Red * * * you will end up in an alley."

At Feldman's apartment that night, Darneille said:

"Ike, O.K. the next day or so. I'll make $10,000, he [Cherpakov] will make $10,000, and you will make $100,000."

On July 28, 1955, Feldman noticed that Ciro's Bar, which was closed on July 22, 1955,[3] by the State authorities

---

2. A kilo or kilogram is equivalent to about 2⅕ pounds.

3. Feldman seems to be in error regarding the closing date of Ciro's Bar. In one part of his testimony, he states that he, Miflin, Darneille, and Miss Howard waited "until approximately 2 a. m. the morning of the 23rd of July" for Ferrari, and they then "departed the bar" and went to Feldman's apartment. Elsewhere his testimony is as follows: "On July 22, 1955, at approximately 10 p. m. * * * I returned to Ciro's for the purpose of seeing Mr. Darneille and some of the present defendants, and when I got to Ciro's *the door was closed.* . . . I was at a loss as to why the place was closed." If Ciro's place was locked at 10 p. m. on July 22, why would Feldman and his party wait there for Ferrari until 2 o'clock the next morning? Indeed, how could they get into the bar at all? Perhaps the error is typographical, and Feldman's return to Ciro's in quest of Darneille took place at 10 p. m. on July 23.

because of a "legal beef", had been re-opened. Ferrari was tending bar as of yore, and Darneille and Cherpakov were there too. Darneille informed Feldman that "We got the deal," which was "all set in a day or so." After Darneille and Cherpakov had left, *Ferrari wanted to know whether Feldman "was going to do business with them".* Feldman said "Yes."

Before Cherpakov left the bar, Feldman gave him the address and the telephone of a New York gangster as a reference.

On July 29, 1955, Feldman saw Darneille at Ciro's, while Ferrari was tending bar. Again Darneille said that "It's just a matter of a day or two." Once again, on July 30, 1955, at Ciro's Bar, Darneille said to Feldman: "Ike, the deal is ready. Just hang on." * * * "Any minute we got the deal."

Finally, on the night of July 31, 1955, while Ferrari and Darneille were at the bar, the latter said to Feldman, "Go to see Charlie [Garcia] and get the junk." Garcia was at the "Macombo" Bar on Grant Avenue.

At about 12:45 in the morning of August 1, 1955, Feldman introduced himself to Garcia, Sr., at the Macombo, where the latter was tending bar. Garcia had been expecting him, and knew where Feldman's apartment was. Garcia agreed to meet Feldman as soon as Garcia closed the bar.

About two hours later, Garcia, Sr., went to Feldman's apartment with another man, whom he introduced as his brother Bob, but who was subsequently identified at Charles Clarence Garcia, Jr., his son.

At that time Feldman brusquely told his visitors that all they had been asking for had been "references". He threw $20,000 down on the couch, and told them "to put up or shut up". The Garcias said that they would return Tuesday evening to give their answer, "checking with their friends as to what they could get and how much." Senior said that they wouldn't "move for less

than a pound or even a kilo". Senior told Feldman that it was O.K. to deal with Ferrari, who was "a good guy".

On the evening of August 2, 1955, the Garcias again went to Feldman's apartment. Senior said that he had "contacted" his "people", and that they could get Feldman "as much as you want when you want it". However, he added that the Garcias were going to take their time, since he and his associates didn't "want to get caught".

Senior quoted a price of $450 an ounce, and Feldman made a counter-offer of $400 an ounce, and said he was willing to buy a kilo. Senior then left to telephone to his "people" to "see what they want to do".

The Garcias returned in about an hour, and Senior reported that his "people" said that it was O.K. "We'll deal for $400 an ounce, but I'll only get you a pound this time to see if you like it. * * * If you like it, then we can start dealing in kilos."

*Thereupon Feldman paid over to the Garcias 64 $100 bills.*

On the evening of August 4, 1955, at Ciro's, Ferrari, who, as usual, was tending bar, went over to Feldman and warned him to "get out of here" because "The feds, the government, are looking for you." Ferrari added, *"Look, Ike, if you get in trouble I am in trouble."*

On August 13, 1955, Feldman received from Junior delivery of 13 ounces, 365 grains of narcotics, in six rubber containers, in a paper bag, at "the Bayside Motel, Cabin 25, fourth drawer down, * * * [in] a paper bag".

On August 2, 1955, Feldman had complained to Senior that a man "passing himself off as Bones Remmer" was in reality Bones Darneille. When Feldman went back to Ferrari on August 17, 1955, the two men talked about Darneille, and Ferrari said he was "sorry", that "there was a misunderstanding between Bones Darneille and" Feldman, "and that Bones would be in and we could straighten it out."

On the same evening, Feldman informed Senior that the narcotics were of inferior quality. On August 18, 1955, in Ciro's Bar, Cherpakov said to Feldman, "It's rough, the way you deal, in pound lots."

On August 22, 1955, at Ciro's in the presence of Darneille, Cherpakov expressed regret that "the stuff wasn't any good", and Darneille said, "You know, you got to be careful. This town is hot; a lot of federal agents around here."

At that meeting, Cherpakov told Feldman that the latter could go across the border to Juarez, Mexico, and "get the stuff for $100 an ounce", adding: "The thing that costs a lot of money is bringing it across the border." On the same occasion, Cherpakov commented that Feldman had been in town only a month and had "scored already", adding: "There's none bigger than Red Ferrari and Ciro's."

*Feldman had not previously discussed with any of the appellants, but only with the Garcias, the quantity or quality of the narcotics that had been delivered to him, or the fact that such a purchase had been made.*

On August 17, 1955, Ferrari refused a dinner invitation from Feldman saying:

"No, Ike, I am afraid to go out with you. * * * I know what you are doing. I know who you are dealing with. I don't know about your deals. I can't go out with you. Like I told you once before, I don't want no trouble, and we aren't going to have any trouble."

For the first time, it was developed on cross-examination of Feldman that his apartment was "bugged", or "wired" for sound, and that the listening devices had been monitored by other agents who "were located adjacent to the apartment", "you could not call it the same apartment", "In another room".

Feldman testified as to the disposition of the recordings as follows:

"The recordings were brought back to the Federal Office Building and each morning the agents would make their official daily reports from the recordings. *Then we would take the recording and re-use it again, and as you re-use the recording, it erased all the old writing and conversation and recorded the new conversation.*"

Testimony offered through Treasury Agent Milton K. Wu as to conversations overheard by him by means of "certain listening devices" was not admitted by the Court, on objection by counsel for the defense.

Each appellant testified as a witness in his own behalf.

3. *The Evidence Supported the Verdict Against Each Appellant.*

Ferrari and Darneille maintain that the evidence was insufficient to support the verdict as to either of them. Cherpakov made no such claim. Knight filed no brief, and was not represented by counsel at the oral argument before this Court.

The arguments of Ferrari and Darneille on this point will be considered together.

The evidence clearly establishes the concert of action and the community of purpose of all the appellants. By their own admissions, they were well acquainted with each other. They were admittedly intimately familiar with traffic in narcotics, either as users or convicted peddlers. Except Cherpakov, they also admitted having discussed narcotics with Feldman, although they gave versions of the conversations that were innocuous, so far as they were concerned.

Cherpakov testified that when he heard Feldman ask Darneille how many ounces were in a kilo, he warned Darneille not to "talk about narcotics", since "they can get you for conspiracy if you talk about it." Cherpakov also stated in the latter part of August, at Ciro's, Feldman informed him that "he had scored". "Scored", in the language of the narcotic underworld, means "succeeded in

making a purchase". Cherpakov claimed on the stand that he made no reply to Feldman's announcement, but that they "talked about other things".

As we have seen from Feldman's testimony, fully summarized, supra, each appellant was aware of the discussions had by the others regarding narcotics, when they were not personally present. The underground of the underworld is extremely efficient.

Only the hopelessly naive can doubt that the appellee has adduced substantial evidence to sustain its case. The sophisticated reader of the record will be convinced that, not only as to Cherpakov and Knight—who do not gainsay it—but also as to Ferrari and Darneille, there is ample testimony to support the verdicts.

In Stoppelli v. United States, 9 Cir., 1950, 183 F.2d 391, 393, certiorari denied, 1950, 340 U.S. 864, 71 S.Ct. 88, 95 L.Ed. 631, this Court said:

"It is not for us to say that the evidence was insufficient because we, or any of us, believe that inferences other than guilt could be drawn from it. To say that would make us triers of the fact. We may say that the evidence is insufficient to sustain the verdict only if we can conclude *as a matter of law* that reasonable minds, as triers of the fact, must be in agreement that reasonable hypotheses other than guilt could be drawn from the evidence. [Case cited.] In the cited case, Judge Prettyman pertinently observes: 'If the judge were to direct acquittal whenever in his opinion the evidence failed to exclude every hypothesis but that of guilt, he would preempt the functions of the jury. Under such rule, the judge would have to be convinced of guilt beyond peradventure of doubt before the jury would be permitted to consider the case.' [Curley v. U. S., 81 U.S.App.D.C. 229] 160 F.2d at page 233. [Case cited.]"

### 4. There Was No Abuse of Discretion in the Denial of a Motion for a Mistrial on the Ground of Newspaper Publicity.

 Counsel for Ferrari moved for a mistrial, on the ground that he had a "feeling * * * from reading the newspapers, that the government, through some of its agents, have attempted to influence and prejudice the minds of this jury by revealing to the newspapers what, allegedly, a witness would testify to and allegedly grounds for her testifying." Counsel then quoted from articles in two San Francisco newspapers relating to the expected testimony of a "Miss Davis", *infra*, who, the San Francisco Examiner reported, "was prepared to testify that Ferrari acted as her procurer and supplied her with narcotics across the bar of his Ciro's tavern," and who, according to the San Francisco News, "was afraid to testify, afraid of the mob," etc. Darneille, who has filed briefs in this Court in propria persona, did not join in the motion but is raising the objection in this Court. We are considering the contentions of both appellants.

There was no request that the jury be examined on voir dire to determine whether they had read the newspaper articles, and, if so, whether they had been influenced thereby.

In United States v. Carruthers, 7 Cir., 1945, 152 F.2d 512, 519, certiorari denied, 1946, 327 U.S. 787, 66 S.Ct. 805, 90 L.Ed. 1014, rehearing denied, 1946, 327 U.S. 817, 66 S.Ct. 816, 90 L.Ed. 1040, second petition for rehearing denied, 1946, 327 U.S. 819, 66 S.Ct. 897, 90 L.Ed. 1014, the Court said:

"It cannot be denied but that the newspaper article in question was inflammatory and prejudicial in character and its publication prior to verdict, improper and unethical. Its publication could, under some circumstances have brought to naught a long, tedious and expensive trial. Whether the Court should have in this instance declared a mistrial

depends upon all the circumstances. A motion of this character is addressed to the sound discretion of the trial Court, [Cases cited] and the burden is upon appellant to show an abuse of discretion and prejudice to him. [Cases cited.] If Juror Vincent read the article at all, he could not remember its contents. * * * If the juror read the inflammatory portion of the article at all, it apparently made no impression as he appeared to have no recollection concerning it. We can only assume that the jury answered the trial court's inquiries truthfully, and, so assuming, we find that no juror except Vincent read the article and that Vincent's mind was in no way affected by what he had seen or read. Under such circumstances we think appellant has failed to show prejudice resulting to him from the publication of the article and we hold that there was no abuse of discretion on the part of the trial court in the denial of his motion."

Ferrari further complains that "The effect of this newspaper publicity was not removed by any admonitions to the jury during the course of the trial or prior to its commencement". The record of proceedings on *voir dire* during the selection of the jury is not before us. In any event, in the absence of proof that any member of the jury saw or heard the stories mentioned, failure to tell the jurors not to read newspapers or listen to the radio is not reversible error.

In United States v. Griffin, 3 Cir., 1949, 176 F.2d 727, 731, certiorari denied, 1950, 338 U.S. 952, 70 S.Ct. 478, 94 L.Ed. 588, rehearing denied, 1950, 339 U.S. 916, 70 S.Ct. 559, 94 L.Ed. 1341, the Court used the following language:

"There is no proof that the jury or any member of it saw or heard the stories mentioned, but assuming that this did occur, there is not the slightest reason for inferring that real harm resulted to appellant thereby. [Case cited.] Complaint is made that the Court in its above admonition did not directly tell the jury not to read the newspapers or listen to the radio. In our judgment, the Court was entitled to consider as he did, that he was dealing with an intelligent American jury of honesty and integrity. He told its members plainly [as here] that they were to decide the case only on the evidence they heard in the court room, not what they 'might happen to hear or read elsewhere'."

In the instant case, the District Court's precise words of caution to the jury were as follows:

"If you have had occasion to read any newspaper accounts or listen to any radio publicity or television, or anything like that in connection with this case, I counsel you to disregard it. You are to try this case solely upon the evidence that has been presented here in court."

In his closing brief, counsel for Ferrari complains that, rather than giving the jury "a strong admonition to disregard newspaper publicity," the court merely stated "I counsel you to disregard it." We feel sure that, in the language of Griffin, the "intelligent American jury of honesty and integrity" understood what the District Judge meant and comprehended what their duty was, after listening to the Court read *the entire paragraph, supra.* A class in higher semantics might be interested in the distinction between "counsel" and "admonition": so far as this case is concerned, we are not. The appellants did not complain of the instruction when it was given, as required by Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., *infra,* and they submitted no alternative instruction.

Long before the advent of radio or television, Mr. Justice Holmes, in Holt v. United States, 1910, 218 U.S. 245, 251, 31 S.Ct. 2, 5, 54 L.Ed. 1021, used language that is even more timely today than it was when he uttered it:

"The counsel for the prisoner filed his own affidavit that members of the jury had stated to him that they

had read the Seattle daily papers with articles on the case, while the trial was going on. [The appellant here has made no such showing.] He set forth articles contained in those papers, and moved for a new trial. The court refused to receive counter affidavits, but, assuming in favor of the prisoner that the jurors had read the articles, he denied the motion. * * *

\* \* \* \* \* \*

"*If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day.* [Emphasis supplied.]"

As was observed in an article entitled "Due Process for Whom—Newspaper or Defendant?", appearing in the Stanford Law Review for December, 1951, Volume 4, No. 1, pages 105–106:

"But not every factual interference with a trial is a violation of due process. *The parties may not demand trial in a vacuum.* Newspaper interference, like any other interference, will not cause an unfair trial, unless it is serious enough to be a violation of our ideas of justice." [Emphasis supplied.] [4]

■ 5. *The Testimony of Gloria Davis Was Admissible to Impeach Ferrari, and the District Judge's Instructions Protected Darneille from Being Harmed by It.*

Both Ferrari and Darneille assert error in the admission of the testimony of Gloria Davis. Their arguments will be considered separately.

(a) *Ferrari's Contentions*

Ferrari recites that "on cross-examination by the United States Attorney," he gave the following testimony:

"Q. Have you ever sold any narcotics?

"A. No, I haven't."

The appellant contends that "The issue raised by this particular question had not been gone into on direct examination," etc. Here Ferrari commits his initial error in re Gloria Davis. His counsel *had* gone into the question of Ferrari's sale of narcotics. On direct examination, the appellant was asked:

"Q. Have you had in your possession or have you seen within the last year, year and a half, Mr. Ferrari, any narcotics whatsoever?

"A. None whatsoever."

Mrs. Davis testified that she had purchased narcotics from Ferrari "About a year and a half ago now", that is, during a period beginning about a year and a half from the time at which she was testifying. She also testified that she had been "working as a call girl" for Ferrari.

The appellant insists that "The law is quite clear that impeachment on a collateral issue is not permissible". But the Supreme Court has held that where the defendant has, on direct examination, "made the sweeping claim" that he has "never dealt in or possessed any narcotics," "there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." [5]

In the instant case, Ferrari made a "sweeping" denial that, during the preceding year and a half, he had neither *seen* nor *possessed* any narcotics "whatsoever".

Whatever doctrinaire criticism might be made of the admission of Mrs. Davis' testimony, any possible prejudice to Ferrari was obviated by the following spe-

4. See also, on this entire question of the effect of newspaper publicity upon a jury trial, Bucher v. Krause, 7 Cir., 1952, 200 F.2d 576, 583–584, certiorari denied, 1953, 345 U.S. 997, 73 S.Ct. 1141, 97 L. Ed. 1404, rehearing denied, 1953, 346 U.S. 842, 74 S.Ct. 17, 98 L.Ed. 363.

5. Walder v. United States, 1954, 347 U.S. 62, 65, 74 S.Ct. 354, 98 L.Ed. 503. See also Dowling Bros. Distilling Co. v. United States, 6 Cir., 1946, 153 F.2d 353, 361, certiorari denied, sub. nom. Gould v. United States, 1946, 328 U.S. 848–849, 66 S.Ct. 1120, 90 L.Ed. 1622, rehearing denied, 1946, 329 U.S. 820, 67 S.Ct. 29, 91 L.Ed. 698; 50 A.L.R.2d 569–570.

cific and emphatic instruction to the jury given by the District Judge:

"You are instructed that the testimony of Gloria Davis does not relate to the guilt or innocence of any of the defendants.

"Mrs. Davis's testimony was admitted for one purpose, and one purpose only, that is, to impeach the testimony of the defendant Ferrari and the only effect that such testimony can have is to assist you in determining the credibility of the defendant Renaldo Ferrari."

We do not subscribe to the school of thought that, while insisting that the trial judge shall instruct the jury fully and accurately on all pertinent legal questions, is prone to assume that, in a given instance, the jury didn't pay attention to the court's instructions anyway, but were carried away by their own pet prejudices!

(b) *Darneille's Contentions*

Darneille did not raise any objection to Gloria Davis's testimony in his opening brief, but only in his closing one. We do not consider this "fair debating". Furthermore, he has failed to give either the "full" or *any* "substance of the evidence admitted", as required by our Rule 18 (2) (d), 28 U.S.C.A., *infra*.

This appellant objects to the absence of any instruction that such testimony was not to be considered evidence against defendants not directly concerned, combined with the failure of the court to instruct the jury that "the hearsay testimony" "improperly admitted against appellant could not be considered." He does not explain to what "hearsay testimony" he refers.

The emphatic limiting language in the Court's instruction regarding the testimony of Gloria Davis, already quoted in full, adequately protected Darneille's rights.

6. *The Appellant Darneille Was Not Denied the Right to Subpoena "Necessary Defense Witnesses".*

▆▆▆▆ The appellant Darneille complains he was "deprived of his Constitutional rights" because the appellee failed to produce Janet Jones, after a subpoena had been served on George White, head of the Bureau of Narcotics in San Francisco.

Miss Jones was a special employee of the Bureau of Narcotics who Feldman knew or "assumed" had been involved in "narcotics traffic". He also knew that at the time when she was working for the Bureau she was not an addict. Feldman testified that she was supplied to him to give him "color", and that all he "wanted Miss Jones to do was play the part".

At the time he testified, April 24, 1956, Agent Feldman had not seen Miss Jones for about six months, and did not know where she was at that time. She ceased to assist the Bureau on August 1, 1955.

Herbert R. Kessler, attorney, testified that he attempted to serve a subpoena upon Miss Jones by leaving a copy with White, who said he had no idea of her whereabouts, that he had no intention of finding her, and that "she had worked for him at one time, but because she had taken morphine, marijuana and a goof-ball at the same time, that she was pretty far out of it and he had to let her go."

Rule 17(d) of the Federal Rules of Criminal Procedure provides in pertinent part:

"Service of a subpoena shall be made by delivering a copy thereof to the person named and by tendering to him the fee for 1 day's attendance and the mileage allowed by law."

Service of a subpoena on a former employer who plainly says that he has no intention of finding the desired witness, does not meet the requirements of Rule 17(d). Darneille has made no showing that Miss Jones was not available if a search had been made on his behalf, or that any search was in fact made. The appellee was under no obligation to look for the appellant's witnesses, in the absence of a showing that such witnesses were made unavailable through the suggestion, procurement, or negligence of the appellee.

In Thomas v. United States, 1946, 81 U.S.App.D.C. 314, 158 F.2d 97, 99, certiorari denied, 1947, 331 U.S. 822, 67 S. Ct. 1303, 91 L.Ed. 1838, the Court observed:

"Appellant must plead and prove his own case and is responsible for the production in court of witnesses necessary to do so."

Darneille is guilty of a gross misstatement of the record when he states that "Col. White unlawfully refused to comply with the court's order and informed the appellant that if he did know where she was he would not produce her." We have already noted that Kessler, Darneille's own witness, testified that White told him that he did not know Miss Jones's whereabouts and "that he had no intention of finding her". The Court's order was not directed to him, and therefore he could not have refused to comply with it; nor did he say that "if he did know where she was he would not produce her". It simply was not his duty to *look* for her.

The appellant Darneille also asserts that "There is every reason to believe the government knew of her whereabouts and would have called her as a witness but for fear her testimony would not corroborate that of the agent with whom she was compelled to cooperate"; and "The fact the U. S. Attorney failed to call her as a witness is evidence of the fact he feared such corroboration of appellant's contentions".

Such arguments might be permissible in an address to the jury, but they have no place in a brief in an appellate court. They embody pure speculation.

In Deaver v. United States, 1946, 81 U.S.App.D.C. 148, 155 F.2d 740, 744, certiorari denied, 1946, 329 U.S. 766, 67 S.Ct. 121, 91 L.Ed. 659, the Court used the following pertinent language:

"We know of no rule which holds it error for the government to fail to put on the stand a witness, not deemed necessary to its case, who might conceivably have given testimony favorable to the defendant. .

*It is for the defendant to make his own defense."* [Emphasis supplied.]

Finally, Darneille complains that he "was in jail and not free to search out his witnesses or the government's." But the record discloses that he was represented by two attorneys, who seemed alert and zealous in protecting his rights.

There is no merit to Darneille's contention that he "was denied the right to subpoena the necessary defense witnesses".

7. *The Court's Instructions Were Adequate.*

 The three appellants who have filed briefs separately complain of the refusal of the District Court to give an instruction to the effect "that if a party has stronger or more satisfactory evidence which it could produce and fails to do so, the jury might infer that it would be adverse to that party".

The record fails to show that Darneille's counsel submitted any proposed instructions, and he failed to object to the instructions given, as required by Rule 30 of the Federal Rules of Criminal Procedure, which Rule frequently has been enforced in recent decisions of this Court.

Ferrari objected to the Court's failure to give his requested instruction No. 9, "relating to the suppression by the prosecution of the tapes and the fact that presumption [sic] attaches that they would have been adverse"; and to the failure to give proposed instruction No. 12, "that if a party has stronger or more satisfactory evidence which is not produced, the jury should distrust the weaker evidence". He does not set forth in his brief the language "totidem verbis" of the rejected instructions, nor does he set forth the grounds for his objections in the Court below—and this latter for the simple reason that he failed to state any grounds.

Cherpakov sets out in his brief the language of his requested instructions, which was rejected by the Court. That instruction likewise relates to the failure "to produce stronger and more satisfac-

tory evidence" when "it [was] within the power of a party to produce" it. Like Ferrari, Cherpakov has failed to set forth the grounds of the objection "urged at the trial", again for the simple reason that he failed to state the grounds at that time.

All three complaining appellants were represented by able counsel in the Court below, and therefore can offer no excuse for the failure to comply with our Rule 18(2) (d), to which reference has already been made in connection with the failure of Darneille to set out the substance of the testimony of Gloria Davis to which objection was made.

In the first place, Rule 18(2) (d) deals with an appellant's "Specification of Errors". None of the three appellants herein filing briefs has included such a "Specification", *eo nomine*. Ferrari has subdivided his brief into seven parts, with appropriate headings. Cherpakov has divided his main brief into three sections, and Darneille has arranged his opening brief into five "Arguments".

But our foregoing recital demonstrates that even in more substantial respects none of these three appellants has fully complied with Rule 18(2) (d), which reads in pertinent part as follows:

"2. This brief shall contain * *

— 

* * * * * *

"(d) In all cases a specification of errors relied upon which shall be numbered and shall set out separately and particularly each error intended to be urged. When the error alleged is to the admission or rejection of evidence the specification shall quote the grounds urged at the trial for the objection and the full substance of the evidence admitted or rejected, and refer to the page number in the printed or typewritten transcript where the same may be found. When the error alleged is to the charge of the court, the specification shall set out the part

referred to totidem verbis, whether it be in instructions given or in instructions refused, together with the grounds of the objections urged at the trial."

We have repeatedly applied Rule 18 (2) (d) in recent decisions of this Court, and no useful purpose would be subserved by copious citations.

Cherpakov states that his requested instruction regarding "stronger and more satisfactory evidence" related to the recordings in Feldman's apartment. Ferrari's requested instructions were offered in connection with the recordings and also in connection with the testimony of Janet Jones.

The reasons for the appellee's inability to produce the witness Janet Jones or the recordings have already been outlined, and need not be rehearsed here.

Referring to failure to produce evidence as indicating its "unfavorable tenor", Professor Wigmore says:

"It is plain that the inference is based, not on the bare fact that a particular person is not produced as a witness, but on his non-production when it would be natural for him to produce the witness if the facts known by him had been favorable * * *

"(a) In the first place, the person must be *within the power* of the party to produce. This is unquestioned."[6]

While it may be argued that it would have been more prudent to preserve the recordings, the explanation of their unavailability, if believed by the jury, destroys the presumption that the appellants seek to draw. And the verdicts indicate that the jury credited the explanation.

8. *The Court's Response to a Question Propounded by the Jury Did Not Constitute Reversible Error.*

By stipulation, the record on appeal has been augmented as follows:

6. Wigmore on Evidence, Vol. II, § 286, page 166, Third Edition, and the many cases cited in the main text and on pages 48–49 of the 1955 Pocket Supplement.

The following note was sent to the District Judge by the jury after it had commenced its deliberations:

"The jury would like to know if it would be permissable [sic] to play goverment [sic] recordings in a court if they were available."

Cherpakov complains that "it is improper to instruct a jury in a [felony] case without notice to counsel and outside the presence of the defendant." Darneille raises the same question. Ferrari raises it only in his reply brief, which is improper debating. At any rate, Ferrari can hardly complain, since it was *his* attorney who was selected to confer with the District Judge in chambers, *infra*.

(a) *The Manner in Which the Supplementary Instruction Was Given Did Not Violate Any of the Appellants' Rights.*

An affidavit filed by Michael Lewton, counsel for Cherpakov, on May 7, 1956, reads in part as follows:

" * * * the jury commenced their deliberations herein on [May 2, 1956], at approximately 11 * * a.m. * * * That at or about * * * noon of said day, counsel for all the above named defendant * * * were present in the hallway on the third floor of the Post Office Building, * * * San Francisco, * * * immediately outside the courtroom of United States District * * * Judge Edward P. Murphy, * * * before whom this action was tried. * * * the bailiff of said court appeared in said hallway and announced that one of the attorneys representing the defendants was wanted in Judge Murphy's chambers * * * affiant stated to said bailiff that the attorneys for all defendants were present in said hallway and that all said attorneys would appear in chambers. The Bailiff thereupon stated that only one attorney representing the defendants would be permitted to appear in chambers. [The attorneys for the other appellants] agreed that if only one attorney was to be permitted to appear in chambers, * * * Harry P. Glassman, Esq., attorney for * * * Ferrari, would be the attorney so to appear.

" * * * Glassman thereupon went in the chambers of Judge * * * Murphy * * * several minutes thereafter * * * Glassman * * * emerged from said chambers and informed the attorneys for the other [appellants] * * that the jury had requested an additional instruction on the following subject: That if the tape recordings made by the government agents in the course of their investigation of this case had been available and if they had been offered in evidence, would they have been admitted in evidence * * * the court informed * * * Glassman * * * that the jury would be instructed as follows: That the tape recordings were not available, that they were not offered in evidence, and the jury need not concern itself with whether they would have been admitted in evidence or not.

" * * * affiant was not informed by any one that additional instructions had been requested by the jury, nor was he informed that additional instructions had been given to the jury until he was so informed by * * * Glassman * *

" * * * at all times mentioned herein the attorneys for all other [appellants] * * * were present in said hallway * * * Cherpakov was in the custody of the * * * Marshal on the second floor of said Post Office Building * * * the jury was deliberating in the jury room, * * * immediately adjacent to said courtroom [,] [which] was not in use for any other action or proceeding and was available for * * * any proceedings that might be taken in this action."

Glassman filed an affidavit corroborating Lewton, except that he did not indicate the nature of the instruction that

the District Judge intended to give, but stated that the Judge said he would reply to the jury's question by sending to the jury room an instruction in writing. Glassman also deposed that "the contents of said instructions [sic] were duly noted in the record, and a written copy thereof was sent to the jury in the jury room."

Counsel took no immediate exception to the additional instruction, as required by Rule 30 of the Federal Rules of Criminal Procedure, which provides in part that "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

On May 7, 1956, however, counsel for all the appellants "made motions for new trial or in the alternative judgments of acquittal", all of which motions were denied.

On the record before us, it was reasonable for the District Judge to assume that Glassman represented all the appellants *quoad* the conference at which the District Judge announced that the additional instruction would be given. The precise text of that instruction, according to the supplemental record, was as follows:

"May 2 — 56
"Mr. Foreman and Members of the Jury,
"The records are unabailable [sic]. Furthermore they are not in evidence.
Therefore you may not have them.
"(Signed) Edward P. Murphy
"USDJ"

As was said by Judge Sibley in Outlaw v. United States, 5 Cir., 1936, 81 F.2d 805, 809, certiorari denied, 1936, 298 U.S. 665, 56 S.Ct. 747, 80 L.Ed. 1389:

"If the jury had been recalled and the charge read to them in appellant's presence, no different result can be supposed * * * we do not agree that every communication in the constrained absence of the accused necessarily requires a new trial."

In his reply brief, Cherpakov contends that *Outlaw* in reality "strongly supports" his position, because of the following language therein:

"If the judge in this case had delivered any objectionable or even any new instruction to the jury, we would be prepared to hold that denial of the opportunity to hear it and to take exception to it ought to work a new trial."

In the instant case, the message sent back to the jury by the District Judge was in reality neither an "objectionable" nor a "new" instruction at all. The Court simply recited three undisputed facts: namely, that "The records are unavailable"; that "they are not in evidence"; and that consequently the jury couldn't have them. We perceive here no statement of law, either new or objectionable.

In United States v. Compagna, 2 Cir., 1944, 146 F.2d 524, 528, certiorari denied, 1945, 324 U.S. 867–868, 65 S.Ct. 912, 89 L.Ed. 1422, rehearing denied, 1945, 325 U.S. 892, 65 S.Ct. 1084, 89 L. Ed. 2004, after the jury had been locked up, it sent out a note, asking that certain testimony should be read to them. The judge, who had apparently left the court room, on his way back to it, "'stopped in the jury room and asked them if that is what they meant about that, if they wanted it read'". Judge Learned Hand said:

"As to the visit of the judge, it is true that courts are extremely jealous of anything of the kind, once the jury has been locked up; and we do not wish to abate that jealousy in the least; it is most undesirable that anything should reach a jury which does not do so in the court room. * * * But, like other rules for the conduct of trials, it is not an end in itself; and, while lapses should be closely scrutinized, when it appears with certainty that no harm

has been done, it would be the merest pedantry to insist upon procedural regularity. [Cases cited.] There cannot be the slightest doubt here that the informality—for, at most, it was no more—did not prejudice the accused."

(d) *The District Judge Was Correct in His Reply to the Jury's Question.*

The query propounded by the jury was what has been termed an "iffy question", of a type that one might decline to answer. We think that courts should exercise similar caution.

Mr. Chief Justice Hughes counseled judicial reserve in such a situation. In Quercia v. United States, 1933, 289 U.S. 466, 470, 53 S.Ct. 698, 77 L.Ed. 1321, he said:

"The influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.' This court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence 'should be so given as not to mislead and especially that it should not be one-sided'; that 'deductions and theories not warranted by the evidence should be studiously avoided.' [Cases cited.] *He may not charge the jury 'upon a supposed or conjectural state of facts, of which no evidence has been offered.'*" [Case cited.] [Emphasis supplied.]

And in Dear Check Quong v. United States, 1947, 82 U.S.App.D.C. 8, 160 F.2d 251, 253, it was said:

"Among the assignments of error is the *novel* charge that the court erred in refusing to inform the jury that the testimony of the absent informer, *had he been present and testified,* should have been viewed with suspicion. It appears from the record that the government was unable to produce the informer. *An abstract instruction concerning the effect of the testimony he might have given had he been present was properly refused."* [Emphasis supplied.]

We are of the view that the Court's response to the jury's question regarding the recordings did not constitute reversible error.

9. *Conclusion.*

We hold that the evidence supported the verdict against each appellant; that the denial of a motion for a mistrial because of newspaper publicity did not constitute an abuse of discretion; that, in the light of the District Court's cautionary instructions, the testimony of Gloria Davis was admissible to impeach Ferrari; that Darneille was not denied the "right" to subpoena Janet Jones; that the Court's instructions in general were adequate; and that, in particular, the response of the District Judge to the question propounded by the jury did not reveal reversible error.

Accordingly, each of the four judgments is

Affirmed.