**UNITED STATES of America,
Plaintiff,**

v.

**Nathan WOLFSON, William F.
Emmons et al., Defendants.**

**Crim. A. No. 1909.**

United States District Court,
D. Delaware.

Feb. 3, 1971.

F. L. Peter Stone, U. S. Atty., and L. Vincent Ramunno, Sp. Asst. U. S. Atty., Wilmington, Del., for plaintiff.

Donald C. Taylor, Wilmington, Del., for defendant, Nathan Wolfson.

William D. Bailey, Jr., Wilmington, Del., for defendant, William F. Emmons.

## OPINION

**LATCHUM, District Judge.**

Defendants were charged with conspiracy to violate the Federal mail fraud statute and with numerous substantive violations of that statute. Following their conviction by a jury on all counts submitted, the defendants moved for a new trial or for judgments of acquittal. Argument was heard on the motions on October 14, 1970.

*The Indictment*

On June 7, 1968 the Grand Jury returned a twenty-nine count indictment against Nathan Wolfson, William F. Emmons, Albert Frost, James B. Thompson and Edward Fishbein. Count 1 charged all of the defendants, under 18 U.S.C. § 371, with a conspiracy to violate the mail fraud statute, 18 U.S.C. § 1341. Counts 2 through 29 charged the various defendants with substantive violations of the mail fraud statute.

The first count alleged that the defendants conspired together to use the mails to further a scheme to defraud a Toronto, Canada insurance company, Agents General Insurance Company, Ltd. ("Agents General"), and persons whom they induced to purchase insurance in Agents General. Twenty-four elements of the scheme were set forth. Basically the defendants were charged with operating and utilizing several corporations, viz., Excess Insurance Corporation of America ("Excess"), Canadian and British Insurance Managers, Ltd.[1] ("Canadian and British, Ltd."), Canadian and British Insurance Managers, Inc., Insurance Reporting Service, Inc., and Interstate Reporting, Inc. (¶¶ 1–5)[2] and with maintaining offices at 2008 and 2008½ Pennsylvania Avenue in Wilmington, Delaware, 1 State Street and 34 Batterymarch Street in Boston, Massachusetts and in the Brandywine Shopping Center in Glen Mills, Pennsylvania. (¶¶ 1–5). The defendants were alleged to have induced George Cooper and Agents General in December of 1965 to enter into a contract whereby Canadian and British, Ltd. was appointed the United States representative and agent for Agents General. (¶ 6).[3] Also in December of 1965 it was charged that Canadian and British, Ltd. appointed Excess as its subagent for selling insurance in the United States. (¶ 7).

It was alleged that various agents throughout the United States were induced to place insurance with Agents General through Excess and Canadian and British, Ltd. (¶ 8), that insurance policy cover notes for Agents General insurance were issued by the defendants and not reported to that company (¶ 14), that premiums were not remitted to Agents General (¶ 15), that a false bordereau[4] and falsified copies of two cover notes[5] were submitted to Agents General (¶¶ 17–18) and that claims arising under these cover notes were intentionally not reported to Agents General. (¶ 22). In addition, the defendants were charged with writing insurance on Agents General prior to the date Agents General received authorization and approval of the Superintendent of Insurance for the Province of Ontario (¶ 13), with writing insurance on Agents General in excess of the company's authorized liability limit and for unauthorized

---

1. From the facts presented at the trial it appears that Canadian and British Insurance Managers, Ltd. was actually operating out of Nassau, Bahamas.

2. "¶" refers to the numbered paragraphs of Count 1 of the indictment. ¶ 4 (and also ¶ 12) relating to Canadian and British Insurance Managers, Inc. and its two Boston offices were later removed from the case. See footnote 9, *infra*.

3. The December Agreement was signed on behalf of British and Canadian Insurance Managers, Ltd. by Lynden O. Pindling, as President, and Geffrey M. Thompson, as Secretary. Prior agreements between the two parties had been signed by defendant Wolfson.

4. Only one bordereau, purporting to cover business written in February 1966, was ever sent to Agents General.

5. These were the only two cover notes ever sent to Agents General.

risks (¶ 20), and with writing insurance after April 14, 1966 on Agents General and after being informed that the latter company's license had been restricted to forbid it from accepting risks outside of Ontario. (¶ 21). It was further contended that the scheme involved the failure to settle claims (¶ 23) and the collection of deductible amounts due under Agents General policies with no intention of settlement. (¶ 24). In addition the defendants were charged with re-insuring policies of National Alliance Insurance Company, Ltd. and Great Fidelity Insurance Company, Ltd.[6] with Agents General without notifying the insurer. (¶ 19).

Five overt acts were alleged to have been committed in furtherance of the conspiracy and scheme, viz., (1) the holding of a meeting in mid-December of 1965 in Delaware between the defendants and Mr. George Cooper and Mr. R. A. Percy, representatives of Agents General, (2) the holding of a meeting on February 11, 1966 in Toronto, Ontario, Canada between the defendants and Messrs. Cooper and Percy, (3) the maintenance of offices at 2008 and 2008½ Pennsylvania Avenue in Wilmington, (4) the maintenance and receipt of mail at Post Office Box 949 at Wilmington, and (5) the maintenance of a checking account in the name of Insurance Reporting Service, Inc. at the First National Bank of Wilmington with defendants Wolfson, Emmons, and Frost having authority to draw checks on the account.

The second count of the indictment charged that the defendants in furtherance of their scheme placed a letter in the mails on or about October 3, 1966 addressed to Multi-Line Underwriters of Kansas City, Missouri. Counts 3 through 29 claimed that the defendants received through the mails certain correspondence relating to the alleged scheme.

Defendant Fishbein pleaded nolo contendere to Count 2 of the indictment prior to trial. The remaining four defendants went on trial November 3, 1969.[7] At the close of the government's case defendant Frost's motion of acquittal was granted without government objection (Tr., p. 1182)[8] and defendant Thompson's motion of acquittal was granted over the government's objection. (Tr., p. 1312). Motions of acquittal as to defendants Wolfson and Emmons were granted as to counts 11, 12, 16, 17, 18 and 22 of the indictment and denied as to the rest.[9] (Tr., p. 1312). Counts 8, 9 and 13, which related only to defendant Thompson, became irrelevant and were stricken from the indictment. (Tr., pp. 1400–1401). On November 25, 1969 the jury found defendants Wolfson and Emmons guilty on all remaining counts.[10]

As previously noted, the case is before the Court on the motions of Wolfson and Emmons for a new trial, pursuant to Rule 33, F.R.Crim.P., or for judgments of acquittal, pursuant to Rule 29 (c), F.R.Crim.P.

■■ Judge Layton of this Court pointed out in United States v. Pepe, 209 F.Supp. 592 (D.Del.1962), aff'd 339 F. 2d 264 (C.A.3, 1964) that the two motions are quite different. The only

---

6. Because no evidence concerning Great Fidelity was ever presented, reference to it was struck from the indictment. See footnote 9, *infra.*

7. The trial consumed twelve days between November 3 and 25, 1969.

8. "Tr., p." refers to the page number of the Trial Transcript; "Paper #" will refer to the docket entry number of the document in the case file.

9. In addition certain alleged elements of the scheme contained in the conspiracy count, ¶¶ 4, 12, and part of ¶ 19, were stricken from the indictment by the Court. (Tr., p. 1400).

10. Both were found guilty on the conspiracy count. In addition, Wolfson was convicted of 16 substantive counts, numbered 2, 5, 6, 7, 10, 14, 15, 19, 20, 21, 23, 24, 26, 27, 28, and 29 in the indictment and Emmons was convicted of 15 substantive counts, numbered 2, 3, 4, 7, 10, 14, 15, 20, 21, 23, 25, 26, 27, 28, and 29 in the indictment.

ground upon which a Rule 29(c) motion can be based is that "the evidence is insufficient to sustain a conviction." A Rule 33 motion for new trial can be based on any of numerous grounds. Therefore, these two motions will be considered separately.

## I. MOTIONS FOR ACQUITTAL

### A. *Conspiracy Count.*

■ The standard to be applied in passing upon a motion for acquittal after trial under Rule 29(c), F.R.Crim.P., is well settled in this District. "[T]he Court scrutinizes the evidence, including reasonable inferences to be drawn therefrom, from the point of view most favorable to the government and assumes the truth thereof. If there is substantial evidence justifying an inference of guilt, irrespective of the evidence adduced by the defendant, the Court must deny the motion." United States v. McGonigal, 214 F.Supp. 621, 622 (D.Del.1963); United States v. Barber, 303 F.Supp. 807, 811 (D.Del.1969); United States v. Roy, 213 F.Supp. 479, 480 (D.Del. 1963); United States v. Pepe, supra, 209 F.Supp. at 594. The Court must, therefore, examine the evidence adduced at the trial.

■ ■ Count 1 charged the defendants with conspiracy to commit mail fraud. That offense occurs when two or more persons confederate together to carry out a scheme to defraud by use of the mails. Marrin v. United States, 167 F. 951, 955 (C.A.3, 1909), cert. den. 223 U.S. 719, 32 S.Ct. 523, 56 L.Ed. 629 (1911). In order to violate 18 U.S.C. § 371, a defendant must have knowingly participated in the scheme to defraud. Windsor v. United States, 384 F.2d 535 (C.A.9, 1967).

■ The Court charged the jury that in order to convict the defendants on the conspiracy count the government was required to prove beyond a reasonable doubt (1) that the conspiracy charged in the indictment was wilfully formed and was existing at the time alleged; (2) that the individual defendant in question wilfully became a member of the conspiracy; (3) that one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment, at or about the time and place alleged; and (4) that such overt act or acts were knowingly done in furtherance of some object or purpose of the conspiracy. In passing upon the present motion the Court must determine whether there is "relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt," that the defendants were guilty as charged. Mortensen v. United States, 322 U.S. 369, 374, 64 S.Ct. 1037, 1040, 88 L.Ed. 1331 (1944).

■ The first issue is whether the prosecution proved that a scheme to defraud existed. Twenty-two elements of the scheme were set forth in Count 1 and incorporated in the remaining substantive counts.[11] It is well established that in a mail fraud case the prosecution does not have to prove each and every element of the scheme alleged. Sasser v. United States, 29 F.2d 76, 77–78 (C.A.5, 1928), cert. den. sub nom. Russell v. United States, 279 U.S. 836, 49 S.Ct. 250, 73 L.Ed. 983 (1929); Cowl v. United States, 35 F.2d 794, 798 (C.A. 8, 1929).

A brief narrative of the evidence adduced at the trial clearly demonstrates that there was placed before the jury ample proof of a "scheme or artifice to defraud" and of a conspiracy involving defendants Wolfson and Emmons to carry out this scheme.

The prosecution's first witness was George Arthur Cooper, the managing director of Agents General. He testified that he had first met Wolfson in October of 1965 when a Mr. Daniel Lang introduced Wolfson as the representative of a group interested in acquiring part of the treasury stock of Agents General

---

11. Originally twenty-four elements were included but two and part of a third were stricken from the indictment. See footnote 9, supra.

and becoming their agents. (Tr., pp. 85–86). Cooper testified that Wolfson told him that Excess was to be named the corporate purchaser and sales representative. (Tr., pp. 86–87). Later, Canadian and British, Ltd., supposedly a foreign corporation with the same principals, was substituted, for tax reasons. (Tr., p. 91). Cooper testified that he and Ralph A. Percy, the president of Agents General, visited the offices of Excess and Canadian and British, Ltd. at 2008 Pennsylvania Avenue in Wilmington during the middle of December to examine their operations. (Tr., pp. 97–98). The deal was finally consummated on January 14, 1966 at a meeting in Canada between Cooper, Percy, and defendants Wolfson and Emmons. (Tr., p. 100). On that date Percy and Wolfson went to the Ontario Department of Insurance to discuss obtaining authority for the sale of Agents General policies in the United States. (Tr., p. 113 and pp. 100–101). After returning from the meeting Wolfson dictated a letter to the Superintendent of Insurance on Agents General stationery for Cooper to sign, indicating the terms and conditions discussed. (Tr., pp. 101, 113–116; GX–6).[12] On January 25, 1966 the requested authority was received from the Superintendent. (Tr., pp. 116–118; GX–7). Copies were forwarded to defendant Emmons. (Tr., p. 119; GX–8). Late in February 1966 Wolfson went to Agents General's office in Canada and dictated a second letter to the Department of Insurance requesting an extension of territory in which his companies could write business. Tr., pp. 120–122; GX–9). The request was granted. (Tr., p. 123; GX–10).

According to Cooper's testimony he received on March 16, 1966 a bordereau[13] purportedly showing business written on Agents General during Feb-

ruary. (Tr., p. 148; GX–11). Later Agents General received what purported to be copies of two cover notes listed on the bordereau. (Tr., pp. 151–154; GX–12). These were the only two ever received by Agents General. (Tr., p. 158). Cooper also testified that Agents General was only authorized to write policies up to a liability limit of $10,000 or $12,500, depending upon the type of policy. (Tr., pp. 144–145; 280). Coverage was restricted to excess fire, excess liability, other than automobile, and automobile physical damage. (Tr., p. 150). Agents General had begun negotiations for reinsurance treaties to increase the liability limitations for insurance to be written in the United States. (Tr., p. 281).

However, about the middle of April trouble developed. On April 14, 1966 a meeting was held at which representatives of Agents General, Canadian and British, Ltd., and the Ontario Department of Insurance were present. (Tr., p. 160). After Wolfson refused to disclose who the principals of Canadian and British, Ltd., actually were, the Superintendent of Insurance announced to those present, including Wolfson, that he was restricting Agents General's license to write insurance to the Province of Ontario. (Tr., pp. 161–162). The following day the license of Agents General was recalled and replaced with one containing this territorial restriction. (Tr., p. 162; DX–4). Written notification was mailed to Canadian and British, Ltd.'s Nassau office and to Wolfson at the Wilmington office. (Tr., p. 162; GX–14 & 15). Following the meeting with the Superintendent, Wolfson, Emmons, and an attorney for them were present at a meeting of the directors of Agents General. (Tr., p. 168). Emmons stated that very few policies had been written other than those listed on the first bordereau. (Tr., p. 169). Prom-

---

12. "GX–" refers to Government Exhibits in evidence. "DX–" will refer to Defense Exhibits.

13. A "bordereau" is a summary of insurance business written for a certain period

of time, usually showing the inception date, name of insured, amount of liability, and premium. (Tr., p. 84).

ises were made to supply Agents General with copies of the remaining cover notes and with a final bordereau. (Tr., pp. 169–170). None of these documents was ever forthcoming. (Tr., p. 170). Nor was there ever any remittance of money for any of the policies written and shown on the bordereau. (Tr., p. 183).

In the early part of May 1966 Cooper received a letter from Capitol Underwriters of Harrisburg, Pennsylvania relative to claims on National Alliance Insurance Company, Ltd. (Tr., pp. 174–175). Later a telephone call was received from Arthur B. Taylor of Texas relative to claims on Agents General policies, and representatives of Agents General conferred with Taylor. (Tr., p. 175). These two inquiries constituted the first and the only notice Agents General received of any claims arising from policies written in the United States. (Tr., p. 173; note GX–16 & 17). No notice of such claims was ever given to Agents General by the defendants or their companies.

On September 30, 1966 the Superintendent of Insurance for the Province of Ontario closed down Agents General permanently. (Tr., p. 171). The only contact either of the defendants had with Agents General from April of 1966 to September 30, 1966 occurred on September 20 when defendant Emmons and two unidentified men entered Cooper's office and demanded $50,000 to be paid them, making threats against the lives of Agents General's officers. (Tr., pp. 289–290). Later in October of 1966 Emmons suggested that all the corporations involved be put into bankruptcy and the principals split the remaining funds. (Tr., p. 295).

Thomas T. Meredith, the head of Capitol Underwriters, Inc., testified that in November of 1965 approximately 200 policies which his agency had written with National Alliance Insurance Company, Ltd. were reinsured by Wolfson and Emmons with Agents General. (Tr., pp. 318–319; GX–21). Meredith also wrote new business on Agents General as of November 25, 1965, continuing on until April of 1966. (Tr., p. 337). Another insurance broker, Arthur B. Taylor, testified that he was authorized by Wolfson to write for Agents General in December of 1965. (Tr., p. 428). Pursuant to this authority, Taylor began selling Agents General policies at least as early as December 14, 1965 (GX–29). Upon being informed of the April 1966 restriction of Agents General's license, Taylor informed defendant Frost of his knowledge on June 26, 1966 and ceased writing Agents General policies. (Tr., p. 582; GX–34).

Taylor supplied evidence that the bordereau sent to Agents General was false and that the two cover note copies also sent to Agents General were not in fact carbon copies. Taylor compared the carbon copies of two cover notes sent to him for transmittal to his insureds, CBI 10011 and 10012, with the carbon copies sent to Agents General and found that the value of the units insured, the effective date coverage began, and the amount of premiums were all different. (Tr., pp. 438–447). A comparison by Taylor of his copies of cover notes received from Excess with the corresponding cover note numbers on the bordereau sent to Agents General showed that the effective date and premiums listed varied on sixteen of the cover notes. (Tr., pp. 460–471). In addition, one cover note was reported to Agents General as "spoiled" though it had been issued. (Tr., p. 461). On other cover notes the amount of premium charged varied from that shown on the bordereau. (Tr., pp. 471–474).

Insurance agent Gene Smyers talked with Taylor in June of 1966. (Tr., p. 670). Eventually, after discussion with the Wilmington office of Canadian and British, Ltd., Smyers began dealing directly with them. (Tr., pp. 670–687). Finally in August of 1966 Smyers had his clients' policies with Agents General cancelled. (Tr., pp. 688–689). Ultimately Smyers filed the complaint with the postal authorities that led to the present case. (Tr., p. 706).

Theodore Clutz and his son Laurence S. Clutz, operators of Multi-Line Underwriters of Kansas City, Missouri, were introduced to Wolfson in the latter part of 1965, (Tr., p. 727),[14] and began writing insurance on Agents General in December. (GX–44, see CBI 10022). After acting as a local agent for some months, in October of 1966, Multi-Line Underwriters was given "binding authority" by Wolfson to issue their own cover notes with Agents General as the insurer.[15] (Tr., pp. 733–735; GX–48 & 49; see GX–44 & 45). The Clutzes wrote policies on Agents General until December of 1966, when they were told to stop by Wolfson and Emmons and, later, by a postal inspector. (Tr., pp. 736; 792). Checks which the Clutzes sent to 2008½ Pennsylvania Avenue were made payable to various companies and were cashed and deposited in various accounts. (Tr., p. 780; GX–50). Canadian and British, Ltd., Excess, and Interstate Reporting, Inc., according to the endorsements, were the principal recipients. (See GX–50). Liability on policies written by Multi-Line Underwriters ranged up to $300,000. (GX–44, CBI 10078).

Peter G. Hansen, an insurance agent from Hurst, Texas, began placing truck liability insurance through defendants with Agents General in March of 1966. (Tr., p. 1061). He wrote six policies in all, the last one being in June of 1966. (Tr., p. 1067). In early September of 1966 he called Wolfson and confronted him with adverse information which he had received about Wolfson's relationship with Agents General. At that time Wolfson stated that he had a contract with Agents General, that he had $200,000 deposited in Delaware, and that he was going to reinsure all Agents Gen-eral policies. (Tr., p. 1063). In spite of this, on October 2, Hansen cancelled all of his outstanding Agents General policies. (Tr., pp. 1064–1068).

Lloyd Jenness, an insurance broker from Elkton, Maryland, had originally placed business with Wolfson and Emmons and Excess in 1965 when they represented a company known as North American Surety. (Tr., p. 603). In 1966 Jenness placed some products liability insurance for certain fireworks manufacturers with Agents General through the Bassett Insurance Agency, operated by a former employee of Jenness. (Tr., pp. 603–604; GX–35 & 36). Liability ran to a maximum of $300,000. (GX–35 & 36).

Eileen Burns, a secretary and telephone operator at the Brandywine Summit Shopping Center in Glen Mills, Pennsylvania, testified that in September or October of 1966 defendant Thompson came in and made an arrangement whereby a telephone was installed in the name of Interstate Reporting, Inc. and connected to Mrs. Burns' telephone answering service. In addition Mrs. Burns received mail addressed to the company. However, at no time was any actual office space ever rented at the shopping center. (Tr., pp. 635–636; 643). Thompson introduced Mrs. Burns to a Mr. Wolfson and a Mr. Emmons and told her that they would be receiving messages through the Interstate Reporting, Inc. telephone. Numerous such messages were received. (Tr., pp. 637–638).

Billy W. Carmichael, the manager of the main office of the Delaware County National Bank in Chester, Pennsylvania, produced a signature card and corporate resolution from the files of the bank showing that defendant Thompson had

---

14. Theodore Clutz, like Arthur B. Taylor was introduced to Wolfson by a Tom Cardwell, an insurance broker from St. Louis. (Tr., pp. 728 & 420). Insurance agent Peter G. Hansen also obtained his original contact with Wolfson through Cardwell. (Tr., p. 1062).

15. This authority was given in a vaguely worded letter dated October 3, 1966 on Insurance Reporting Service, Inc. stationery signed by Wolfson. At a meeting at O'Hare Field in Chicago later that month Wolfson added a handwritten statement to the letter that Agents General was the insurance company concerned. (Tr., pp. 770; 774–776; 818).

opened an account at the bank's Media office on September 8, 1966 in the name of Interstate Reporting, Inc. (Tr., pp. 964–970; 973; GX–71). The account was closed April 11, 1968. (Tr., p. 973).

Arthur Paul Reeher, an independent insurance adjuster, testified that he had handled a claim by Lewis George, Jr. and William George on their National Alliance Insurance Company policy, previously identified as having been reinsured with Agents General. (See Tr., p. 360; GX–21 and GX–80). Reeher testified that a salvage check, GX–75, was erroneously sent to him by the Buckhorn Salvage Company (Tr., p. 1032) in payment for a truck of the Georges which was demolished. (Tr., pp. 1015–1016; GX–80). He forwarded the check to defendant Thompson. (Tr., p. 1026). Reeher testified that in the normal course of the insurance business the salvage check should have been paid to either the lien holder or the owner, if the claim were not paid, or be kept by the insurance company and the loss paid, if the claim were honored. (Tr., pp. 1043–1045). A representative of the bank which held the lien testified that the bank received neither the salvage check nor any settlement. (Tr., pp. 1140–1141). It was stipulated that the Georges received nothing. (GX–80).

Additional evidence was introduced in an attempt to prove a failure to pay claims. (See Tr., pp. 618–628; 853–904; 974–993; 1012–1046; 1122–1132). The indictment had included as an element of the scheme, the failure of the defendants to settle claims arising under insurance policies sold by them. (¶ 23). At trial the government changed its position and attempted to show that claims were simply ignored. (Tr., pp. 899–901). In any event, the offer of proof can only be described as a total failure. A large portion of the testimony was struck by the Court. (Tr., pp. 974–993). Virtually all of the remaining evidence refuted the government's trial contention. (See Tr., pp. 879–881; GX–66; 1015–1017).

However, in spite of the government's failure to sustain its offer of proof as to the treatment of claims, the remainder of the evidence produced was sufficient for the jury to have reasonably concluded that there existed, in fact, a scheme or artifice to defraud.

There was ample evidence presented for the jury to find that the defendants were engaged in a fraudulent scheme masquerading as a respectable insurance business. The testimony given plus the exhibits introduced showed that the defendants sold new insurance policies and reinsured old policies with Agents General at a time when they knew that the Ontario Superintendent of Insurance had not authorized Agents General to transact business in the United States and at a time even prior to the final agreement between the parties establishing an agency relationship. It was proven that Agents General policies were sold by the defendants after they were informed that authority to sell in the United States had been withdrawn by the Superintendent of Insurance and even after Agents General had been closed down and was out of business. It was shown that Agents General policies were sold by the defendants with liability limits far in excess of the limits authorized by Agents General.

The prosecution also proved that the defendants sent a false bordereau of business and two falsified cover notes to Agents General, that the defendants failed to report policies sold to Agents General, that they failed to remit premiums for business transacted, and that they failed to notify Agents General of claims arising under policies which they sold. It was shown that various corporate shells were utilized, various addresses were used, and various bank accounts were maintained by the defendants to carry out these operations.

Further, there was ample evidence adduced at trial from which the jury could have found that Wolfson and Emmons were confederates in the conspiracy to carry out the scheme shown. For example, both Wolfson and Emmons were

present at a meeting in October of 1965 when the representatives of Agents General were informed that Canadian and British, Ltd. was to be listed as their American agent rather than Excess and when two contracts were formalized between the parties and were signed by defendant Wolfson. (Tr., pp. 89–96; GX–2 and GX–3). Emmons orally indicated that he was one of the principals. (Tr., p. 92). Both defendants entertained Cooper and Percy in Wilmington in mid-December of 1965 and held a business conference with them at 2008 Pennsylvania Avenue. (Tr., pp. 97–98). Both Wolfson and Emmons were present at a meeting in Canada on January 14, 1966 which closed the deal and sealed the relationship between Agents General and Canadian and British, Ltd. (Tr., p. 100). According to testimony a letter mailed to Emmons in care of Excess ended up in the hands of Wolfson. (Tr., p. 120). Both Wolfson and Emmons in talking with Cooper denied writing any insurance prior to January 14, 1966. (Tr., p. 279). Wolfson and Emmons supplied Agents General with business records of Excess. (Tr., p. 293). There was testimony that both Wolfson and Emmons received messages through the telephone established by defendant Thompson at the Brandywine Summit Shopping Center in Glen Mills, Pennsylvania in the name of Interstate Reporting, Inc. (Tr., pp. 637–639). In addition cover notes for fireworks liability policies for Keystone Fireworks and Vitale Fireworks Companies were discussed by witness Lloyd Jenness with both Wolfson and Emmons. (Tr., pp. 601–603; 605; 613; GX–35, 36, 37). A secretary for Excess testified that Wolfson, Emmons, and Frost appeared to be the officers of the company. (Tr., pp. 998–999). Both Wolfson and Emmons discussed the reinsurance of policies of National Alliance Insurance Company, Ltd. with insurance agent Thomas T. Meredith, another witness. (Tr., p. 319). Witness Meredith also discussed the problem of claims with both Wolfson and Emmons. (Tr., p. 347). There was testimony that Wolfson introduced Emmons as his partner. (Tr., p. 730). Both Wolfson and Emmons were present at a meeting at O'Hare Field in Chicago in October of 1966 at which time Multi-Line Underwriters, operated by Theodore Clutz and Laurence S. Clutz, had their "binding authority" in regard to Agents General policies confirmed. (Tr., pp. 770–774; 818–819). There was testimony that both Wolfson and Emmons were involved in having Multi-Line Underwriters cease writing Agents General policies in December of 1966. (Tr., p. 792). A signature card showed that both Wolfson and Emmons, as well as defendant Frost and another individual, had the power to write checks on the account of Insurance Reporting Service, Inc. (Tr., pp. 851–852; GX–56). Thus there is ample evidence from which the jury could have found that defendants Wolfson and Emmons were confederated together in their transactions involved in the present case and that the overt acts alleged were committed by one or the other or both.

### B. *Substantive Counts.*

Count 2 of the indictment charged the defendants with placing in the mails a letter to Multi-Line Underwriters in Kansas City, Missouri. The letter itself was introduced into evidence as GX–48. (Tr., p. 772). It was received by Theodore Clutz through the mails and was opened by him in his office. (Tr., pp. 769–770). No direct evidence that Wolfson, Emmons, or an agent of theirs mailed the letter was ever produced.

The issue thus presented is whether there was sufficient evidence for the jury to have found that the defendants placed the letter in the mails. It is well established that where the placing of a letter in the mails in violation of the mail fraud statute is charged, some evidence must be produced showing that the defendant actually placed the letter in the mails. Freeman v. United States, 20 F.2d 748, 750 (C.A. 3, 1927); Whealton v. United States, 113 F.2d 710, 713 (C.A. 3, 1940); United States v. Hopkins, 357 F.2d 14, 17 (C.A. 6, 1966),

cert. den. 385 U.S. 858, 87 S.Ct. 107, 17 L.Ed.2d 84 (1966). Evidence of mailing can be either direct or circumstantial, but if circumstantial, the circumstances proved "must directly support an inference of the fact and exclude all reasonable doubt concerning its existence." United States v. Berg, 144 F.2d 173, 174–175 (C.A. 3, 1944); Cohen v. United States, 50 F.2d 819 (C.A. 3, 1931).[16] Moreover, the mere receipt through the mails of a letter signed by a person will not support a finding that that person, even if he in fact authored the letter, placed it in the mails. Whealton v. United States, supra, 113 F.2d at 713; Freeman v. United States, supra, 20 F.2d at 750. Thus, in the present case, the mere receipt of the letter signed by Wolfson would not have been enough. However, there was more.

 Theodore Clutz testified that the letter was received in response to a letter which he and his son had mailed to Wolfson requesting written confirmation of the "binding authority" orally given them. (Tr., pp. 762–768; GX–47). In addition Clutz and his son Laurence S. Clutz both testified that Wolfson added a handwritten clarification to the letter at a meeting between them at O'Hare Field in Chicago. At that time Wolfson gave no indication that he had not mailed the letter or that it had not been mailed at his instruction. (Tr., pp. 774–775; 818–819). The Court thus finds that there was ample circumstantial evidence from which the jury could have found that Wolfson, in fact, did mail the letter in question.

 Both the letter itself and its contents were properly admitted into evidence.[17] The contents were properly before the jury for its consideration as to the other issues in the case. In order for a letter or other document containing facts which are material and relevant to be properly admitted into evidence two requirements must be met.

First, the letter must be authenticated and secondly, its contents must come within an exception to the hearsay rule. Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F.Supp. 1291, 1300 (D.Del.1970). The letter in question was received through the mails in response to a letter sent by the Clutzes to Wolfson. (Tr., pp. 762–768; GX–47). It is an accepted rule of evidence that a letter received in due course through the mails in response to a letter sent by the receiver is presumed to be the letter of the person whose name is signed to it and is thus self-authenticating. Scofield v. Parlin & Orendorff Co., 61 F. 804, 806 (C.A. 7, 1894); Winel v. United States, 365 F.2d 646, 648 (C.A. 8, 1966); Purer & Co. v. Aktiebolaget Addo, 410 F.2d 871, 876 (C.A. 9, 1969), cert. den. 396 U.S. 834, 90 S.Ct. 90, 24 L.Ed.2d 84 (1969). However, a gloss has been placed upon this by the case of Consolidated Grocery Co. v. Hammond, 175 F. 641 (C.A. 5, 1910), which held that in order for the "reply letter rule" to be invoked it is necessary for proof to be introduced that the original letter, to which the reply letter in question was responsive, was actually written and mailed. In the present case there was testimony that the original letter, GX–47, was in fact written and mailed to Wolfson. (Tr., pp. 762–766). Therefore, the "reply letter rule" was properly invoked and the letter was thus authenticated. Being written by defendant Wolfson it obviously fell under the party admission exception to the hearsay rule.

 The remaining counts were based upon the receipt of letters by Wolfson, Emmons, and the various corporations involved. Counts 3 and 4 alleged receipt of two letters (GX–22 and GX–21) mailed by Thomas T. Meredith to Emmons. It is an established rule that when mail matter is properly addressed and deposited in the United

---

16. The defendant's own evidence may be used. Berliner v. United States, 41 F. 2d 221 (C.A.3, 1930).

17. Other issues as to the erroneous admissibility of the evidence produced at trial will be discussed later in this opinion.

States mails with postage duly prepaid thereon, there is a rebuttable presumption of fact that it was received by the addressee. Columbian National Life Insurance Co. v. Rodgers, 93 F.2d 740, 742 (C.A. 10, 1937); Hagner v. United States, 285 U.S. 427, 430, 52 S.Ct. 417, 76 L.Ed. 861 (1932); Rosenthal v. Walker, 111 U.S. 185, 193, 4 S.Ct. 382, 28 L.Ed. 395 (1884). But, unless it is shown that a letter is correctly addressed to the street or post office box and city of the addressee or that mail similarly misaddressed is regularly delivered to the addressee by the post office, the presumption will not be entertained. General Accident, Fire & Life Assurance Corp. v. Pacific Coast Casualty Co., 247 F. 416, 419 (C.A. 2, 1917); Baltimore & Ohio R. Co. v. Reaux, 59 F.Supp. 969, 971–972 (N.D. Ohio 1945); Chicago, R. I. & P. Ry. Co. v. Chickasha National Bank, 174 F. 923, 930–931 (C.A. 8, 1909); Cf. Henderson v. Carbondale Coal & Coke Co., 140 U.S. 25, 37, 11 S.Ct. 691, 35 L.Ed. 332 (1891). There was ample evidence in the present record that the defendants used the addresses to which the letters involved in this case were mailed.

■■■ Meredith testified that he placed the letters in the mail in the ordinary course of business. (Tr., pp. 321–324). He did not testify that the letter was properly addressed or that sufficient prepaid postage was affixed. Nevertheless, it has been held that evidence that a letter is duly mailed carries with it the presumption that it carried sufficient postage. Phenix Insurance Co. v. Schultz, 80 F. 337, 340 (C.A. 4, 1897). Yet, the usual presumption that a letter properly stamped, addressed, and mailed is received by the addressee will not prevail where the record does not show the address to which the letter was mailed or shows that the letter was mailed to the wrong address. Flowers v. Aetna Casualty & Surety Co., 163 F.2d 411, 416 (C.A.6, 1947); Kansas City Life Insurance Co. v. Cox, 104 F.2d 321, 325 (C.A.6, 1939); Kiker v. Commissioner of Internal Revenue, 218 F.2d 389, 392 (C.A.4, 1955). Therefore, the requirements necessary to raise the presumption of receipt were not met as to GX–22 and GX–21.

■■ However, there was circumstantial evidence of the receipt by the defendants of GX–22. This evidence was the receipt by Meredith of a telegram, GX–23, purportedly from Canadian and British, Ltd. in Nassau, Bahamas. (Tr., pp. 325–327). Since no objection was made as to the authenticity of the telegram, the parties waived any objection and the telegram can be considered to be authentic. Collins v. Streitz, 95 F.2d 430, 436 (C.A.9, 1938), cert. den. 305 U.S. 608, 59 S.Ct. 67, 83 L.Ed. 387 (1938). The receipt of this telegram sent by one of the corporations on whose behalf defendants acted in response to Meredith's letter was circumstantial evidence that the defendants, in fact, received the letter. This is sufficient to uphold the conviction of defendant Emmons on Count 3. There being no such circumstantial evidence as to GX–21, the evidence presented was insufficient to sustain the conviction of Emmons on Count 4.

Count 5 charged defendant Wolfson with the receipt of GX–19, a letter from witness Cooper to Wolfson. It was identified as having been written by Cooper. (Tr., pp. 181–182). In addition there was testimony that this letter was prepared for mailing and placed in the proper channels for mailing at the Agents General office. (Tr., p. 309). In order for this to be sufficient to show that the letter was mailed certain evidence must be presented. The requirements are set forth in United States ex rel. Helmecke v. Rice, 281 F. 326, 331 (S.D.Tex.1922):

"* * * the ruling principle is that the fact of mailing, where that fact is an important one, must be proven, like any other fact, by direct or circumstantial evidence, and that, where there is no direct evidence of mailing, it is not sufficient proof of mailing to offer testimony merely that the general custom of an office was to mail all letters and notices.

"The better rule, and that which seems to be established by the weight of authority, is that in the absence of direct evidence there must be proof of an invariable custom or usage in an office of depositing mail in a certain receptacle, that the letter in question was deposited in such receptacle, and in addition there must be testimony of the employee, whose duty it was to deposit the mail in the post office, that he either actually deposited that mail in the post office, or that it was his invariable custom to deposit every letter left in the usual receptacle, and that he never failed in carrying out that custom."

The failure to produce the employee whose duty it was to deposit the mail in the post office has been held to be a fatal defect. Clayton Chemical & Packaging Co. v. United States, 150 F.Supp. 628, 629–630 (Ct.Cust.1957); Orlex Dyes & Chemicals Corp. v. United States, 168 F.Supp. 220, 223 (Ct.Cust.1958); United States v. Barnette, 91 F.2d 10, 11 (C.A. 5, 1937); Masters v. United States, 229 F.2d 677, 679–680 (C.A.6, 1956); Cf. Knickerbocker Life Insurance Co. v. Pendleton, 115 U.S. 339, 345–346, 6 S.Ct. 74, 29 L.Ed. 432 (1885).

However, there is a split of authority, as recognized in the *Rice* case, over whether the strict standard enunciated in *Rice* is necessary, particularly whether the mailing clerk's testimony is vital to raise the presumption of receipt in this situation. The J. L. Luckenbach, 1 F. Supp. 692, 703 (S.D.N.Y.1932), aff'd 65 F.2d 570 (C.A.2, 1933); see Annotation 25 A.L.R. 5 and 86 A.L.R. 541. While it would appear that the majority of jurisdictions is in accord with the standard set by *Rice*, some courts have held that the testimony of the mailing clerk is not necessary and that mailing may be presumed from proof of a custom of mailing in the ordinary course of business. My-

ers v. Moore-Kile Co., 279 F. 233, 235–236 (C.A.5, 1922); Livingston v. Becker, 40 F.2d 673, 676 (E.D.Mo.1929); Avant v. United States, 165 F.Supp. 802, 804 (E.D.Va.1958); Roupp v. Woods, 177 F.2d 149, 151 (Em.App.1949). This question does not appear to have been presented to the Third Circuit Court of Appeals or to this Court before.

▇ This Court will apply the stricter test for proof of mailing. It is the opinion of this Court that for a large business enterprise, such as Agents General, where an officer of the company who had a letter placed in an outgoing mail basket would not have personal knowledge that the mail clerk actually deposited the letters in the post office, the strict standard of the *Rice* case should apply.

▇▇ In the present instance the mail clerk was not produced as a witness. No circumstantial evidence was presented as to the defendants' receipt of GX–19.[18] Therefore the evidence was insufficient to sustain the conviction of defendant Wolfson as to Count 5.

Count 6 charged defendant Wolfson with receipt of GX–16, a letter from Cooper relating to claims. As with Count 5, there was evidence of Cooper's authorship and consent to its admission into evidence. (Tr., pp. 249–251; 282; 304–309). However, once again there was no evidence as to mailing sufficient to meet the requirements set forth above. Consequently the conviction of defendant Wolfson as to Count 6 cannot be sustained.

▇ Count 10 charged both Wolfson and Emmons with receipt of GX–17, a letter from Meredith to Excess. (See Tr., p. 285). Meredith testified that he mailed it in the ordinary course of business in the United States mails to Frost. (Tr., p. 373). Evidence that the letter was mailed to the proper address is lacking. Therefore the conviction of Wolf-

18. If two or more letters are mailed in the same mail, and another letter other than the one in question is received by its addressee, it is circumstantial evidence that the letter in question was placed in the mails. Hand & Johnson Tug Line v. Canada S.S. Lines, 281 F. 779, 782 (C.A. 6, 1922).

son and Emmons under Count 10 cannot be sustained.

■ Count 14 charged Wolfson and Emmons with receipt of a memo from Arthur B. Taylor, GX–33. There was ample testimony adduced by the prosecution that GX–33 was, in fact, mailed, Taylor testified that he personally mailed the letter in question (Tr., p. 562), that he put prepaid postage on the envelope (Tr., p. 563), that he mailed it to Excess at Post Office Box 949 in Wilmington (Tr., p. 563), that the envelope in which it was sent had a return address on it (Tr., p. 565), and that the letter was not returned. (Tr., p. 566). The presumption of receipt was thus raised. Therefore the conviction of Wolfson and Emmons as to Count 14 will not be set aside.

Count 15 charged Wolfson and Emmons with receipt of another memo from Taylor, GX–34. Taylor testified that he mailed the memo to Canadian and British Insurance Managers at 2008 Pennsylvania Avenue in Wilmington, which was the address he knew to be the correct one. (Tr., p. 573). Taylor personally mailed it with the proper prepaid postage affixed. (Tr., p. 574). Ample and complete proof of mailing was presented, sufficient to raise the presumption of receipt and uphold the conviction.

Count 19 charged Wolfson with receipt of a letter from Laurence S. Clutz, GX–54. Clutz testified that he mailed the original letter to the defendants at Post Office Box 949 in Wilmington with prepaid postage affixed. (Tr., p. 820). In addition, he stated that the mailing envelope had a return address on it and that the letter was never returned. (Tr., pp. 820–821). Since ample and complete evidence of mailing necessary to raise the presumption of receipt was thus adduced, this count will be sustained.

■ Count 21 charged Wolfson and Emmons with the receipt of a letter from Vera Dee Onstott, an employee of Gene Smyers, GX–43. The letter was admitted as a business record of Smyers' company (Tr., p. 693), but no attempt was ever made to show that it was mailed. Therefore Count 21 cannot be upheld.

■ Count 24 charged Wolfson with receipt of a letter from Laurence Clutz, GX–55. There was testimony that the letter was sent by registered or certified mail and that a return receipt was received. (Tr., pp. 822–823). This circumstantial proof of receipt was sufficient for the jury to have found that defendant Wolfson received this letter. Therefore Count 24 will be sustained.

■ Count 25 charged Emmons with receipt of a letter from Laurence Clutz, GX–46. Clutz testified that the letter was mailed to Emmons at 2008½ Pennsylvania Avenue in Wilmington with proper postage affixed. (Tr., pp. 760–761). While Clutz testified that he might not have placed the letter in the post office himself, he did have personal knowledge that the letter was in fact mailed. (Tr., pp. 761–762). Therefore, the requirements to raise the presumption of receipt were met and the conviction will be upheld.

Count 28 charged Wolfson and Emmons with receipt of another letter from Laurence Clutz, GX–47. Not only was evidence as to mailing sufficient to raise the presumption of receipt adduced (Tr., pp. 762–765), but circumstantial evidence of a reply from the defendants was also adduced. (Tr., p. 768). Thus convictions on Count 28 were adequately supported.

■■ Counts 7, 20, 23, 26, 27, and 29 charged Wolfson or Emmons or both with receipt of various checks made out to one or more of the corporations utilized by them in carrying out their scheme to defraud. As to GX–42 (Count 20) there was a certified mail receipt introduced into evidence showing that the check was mailed by certified mail, with the necessary postage affixed, to the proper address, so receipt can be presumed. (Tr., pp. 682–683; GX–42). As to the remainder of the checks there was testimony that they were placed in the mail, that proper postage was affixed,

and that they were sent to one or the other of the addresses used by the defendants or their various corporations. Thus the presumption of receipt was raised as to GX–59 (Count 7) (Tr., p. 869), GX–28 (Count 23) (Tr., pp. 430; 433–434), and GX–51, 52, and 53 (Counts 26, 27 and 29) (Tr., pp. 780–785). Therefore, the convictions on the six counts relating to the checks will all be sustained.

In summary, this Court, after a careful review of the evidence including all inferences to be drawn therefrom, taken from the point of view most favorable to the government, and assuming the truth thereof, has found that as to Counts 4, 5, 6, 10, and 21 the evidence was insufficient to sustain the convictions. Therefore as to these counts the Court will grant a judgment of acquittal pursuant to Rule 29(c), F.R.Crim.P. As to the other counts the defendants' motions will be denied.

## II. MOTION FOR A NEW TRIAL

In their motion for a new trial and supporting briefs the defendants claim that they were denied their right to a fair trial (1) by the Court's denial of the defendants' motions for severance, (2) by the government's failure to produce Jencks Act material in accordance with the pretrial order, (3) by the Court's refusal to provide the defense counsel with daily transcripts of the testimony of prosecution witnesses at government expense, (4) by the government's concealment and failure to call a witness who would have been useful to the defense, (5) by the government's lack of preparation in its presentation of the case, resulting in the admission of certain evidence of an irrelevant, hearsay, or prejudicial nature, (6) by the government's reference to the defendants in closing argument as "crooks" and "viruses," and (7) by the Court's refusal to give a jury instruction on Canadian law requested by the defendants. These grounds will be dealt with individually.

### A. *Denial Of Severance Motions*

Wolfson and Emmons contend that they were deprived of their constitutional rights by the denial of their motions for severance in that they were prejudiced by being tried with defendants Thompson and Frost. Principally they argue that the Court's granting of defendants Thompson and Frost's motions for acquittal made it appear that they, Wolfson and Emmons, were guilty of any and all wrongdoing shown.

This Court in an earlier opinion rendered in this case (294 F.Supp. 267, 275–276), after a lengthy review of authority rejected the defendants' motions for severance. The defendants have failed to convince the Court of any error in that decision.

■■■ It is well established that the grant or denial of a motion for severance rests in the discretion of the Court, United States v. Marchant, 25 U.S. (12 Wheat.) 480, 6 L.Ed. 700 (1827), and that the trial court commits error only when it abuses its discretion in the matter. United States v. Lipowitz, 407 F.2d 597, 599 (C.A.3, 1969), cert. den. sub nom. Smith v. United States, 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed.2d 466 1969); United States v. Barrow, 363 F.2d 62, 67 (C.A.3, 1966), cert. den. 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967). It is also clear that separate trial should be granted where the defenses of the different defendants are antagonistic and where, as a result, prejudice would result to the moving party. United States v. Sharp, Fed. Cas.No.16,264 (C.C.D.Pa.1815); United States v. Noble, 294 F. 689, 691 (D.Mont. 1923), aff'd 300 F. 689 (C.A.9, 1924). In the present case, however, there is absolutely nothing in the record to indicate any conflict occurred among the defendants.

■■■ In order to set aside a conviction because of refusal to grant a severance a *strong* showing of prejudice is necesesary. United States v. Hutul, 416 F.2d 607 (C.A. 7, 1969), cert. den. 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d

504 (1970), reh. den. 397 U.S. 1081, 90 S.Ct. 1519, 25 L.Ed.2d 820 (1970). In the present case *no* showing of prejudice has been made. Therefore, the Court finds no merit in the defendants' contentions on this issue.

B. *Production of Jencks Act Material*

A paragraph of the pretrial order provided:

"7. *Handling Documents Under Jencks Act* (18 U.S.C. § 3500): The Government will make available to each attorney for the defendants a copy of the prior recorded statements of each witness at least one week before the witness is expected to testify."

The defendants contend that the government violated this provision of the order. The problem arose in this context: When the government called Lloyd Jenness as a witness, the United States Attorney submitted to defense counsel a handwritten page of notes made by Postal Inspector Turner. These were notes relating to a discussion which Turner had previously had with Jenness. At the time the notes were submitted to defense counsel, the United States Attorney stated:

" * * * I have made an effort to find out whether there are any notes of Mr. Turner outstanding, and although the submission is belated according to our prior agreement, it is not belated according to the statute, and I submit this to defense counsel to look at it." (Tr., p. 600).

No objection was made to this tardiness nor was any application for a trial delay presented to the Court at the time. Following the disclosure, the direct examination of Jenness proceeded. During cross-examination by Wolfson's counsel, Jenness was asked questions based on Turner's notes in an effort to impeach Jenness' direct testimony. (Tr., pp. 629–630).

 Defendants' claim that they were in some manner prejudiced is rejected. In the first place, it does not appear that Turner's handwritten notes

of a previous conversation with Jenness were Jencks Act material, as contemplated by the pretrial order. An investigator's "rough notes" or memoranda containing an agent's interpretations and impressions are not normally within the scope of the Jencks Act. United States v. Augenblick, 393 U.S. 348, 354–355, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969); United States v. Hoffa, 349 F.2d 20, 48 (C.A.6, 1965), aff'd 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), reh. den. 386 U.S. 940, 951, 87 S.Ct. 970, 17 L.Ed. 2d 880 (1967); Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); United States v. Crosby, 294 F.2d 928, 951 (C.A.2, 1961), cert. den. sub nom. Meredith v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed. 2d 523 (1962), reh. den. sub nom. Mittleman v. United States, 369 U.S. 881, 82 S.Ct. 1138, 8 L.Ed.2d 285 (1962). The Jencks Act applies only if the memorandum is signed by the witness, Clancy v. United States, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961), or if the memorandum is read back to the witness and affirmed by him as being an accurate statement. Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963). Nothing in the present record indicates that Jenness affirmed Turner's notes. In fact, Jenness disputed a minor portion of their contents on cross-examination.

 But more importantly, even if Turner's notes were considered Jencks Act material, the defendants have failed to point out any prejudice which was occasioned by the prosecution's failure to produce them a week prior to Jenness' testimony, as required by the pretrial order. At most this was a technical violation of the order and not a violation of the Jencks Act requirement since the Act simply provides for disclosure "[a]fter a witness called by the United States has testified on direct examination" and only after a motion by the defendant. 18 U.S.C. § 3500(b). In the absence of any showing of prejudicial harm to the defendants, the Court finds that such a technical violation of the pre-

trial order calling for early disclosure of Jencks Act information does not constitute grounds for granting a new trial.

### C. *Refusal to Provide Daily Transcripts*

▆ The defendants have alleged that they were denied their constitutional rights by the Court's refusal to order that they be furnished with a daily transcript of the testimony of prosecution witnesses at government expense. (Tr., p. 9). The Court finds no error in this ruling. Where a defendant and his counsel are present during all trial proceedings, it has been held that the refusal to order a daily transcript to be prepared is not error. United States v. Kaufman, 393 F.2d 172, 176 (C.A.7, 1968), cert. den. 393 U.S. 1098, 89 S.Ct. 892, 21 L.Ed.2d 789 (1969). In the present case the defendants and their counsel were present throughout the whole trial and had the right to take notes or have secretaries with them to make any notes desired. Neither side had daily transcripts of the testimony.

▆ The Court also denied a motion to allow defendant Wolfson to record the testimony with a tape recorder. (Tr., p. 14). The Court was of the opinion that to allow one of the defendants to operate such a device in court might create a disruption and distract the jury and counsel, preventing the orderly conduct of the trial. The Court also denied the motion because of the possibility of creating a dispute as to the accuracy of the official record. It has been held that, because of the danger of impuning the official record, it is not error to refuse a defendant permission to have his own reporter record the proceedings in shorthand, where both sides were allowed to have secretaries present to take notes. World Wide Automatic Archery, Inc. v. United States, 356 F.2d 834, 837 (C.A.9, 1966), cert. den. sub nom. Hegg v. United States, 385 U.S. 860, 87 S.Ct. 111, 17 L.Ed.2d 86 (1966). The Court thus finds no error in its ruling.

### D. *Concealment Of A Vital Witness*

The defendants have alleged that they were denied their constitutional rights by the government's misconduct in suppressing evidence which would have been vital to the defendants' case. This misconduct was allegedly occasioned by the prosecution's active concealment of S. J. Sexton of Toronto, Canada, the Deputy Superintendent of Insurance for the Province of Ontario. According to a post-trial affidavit filed by F. L. Peter Stone, the United States Attorney for this District and one of the prosecutors in this case, Sexton was brought to Wilmington on November 5, 1969, the third day of the trial. He was interviewed that afternoon in the United States Attorney's office. After deciding that Sexton would not be called as a prosecution witness, the government allowed him to return to Canada. At no time during trial was the Court or defense counsel informed of Sexton's presence in Delaware.

The defendants claim that Sexton, who was present at a meeting held on April 14, 1966 in the office of the Superintendent of Insurance in Toronto, between the Superintendent and the defendants, was of material significance to the defense. The defendants also contend that Sexton could have acted as their expert witness on Canadian insurance law. Since Sexton resided in Canada and was thus not subject to the compulsory process of a United States court, the defendants argue that because of the government's failure to notify them that Sexton was present in Delaware and thus subject to the process of this Court, they were denied their Sixth Amendment right "to have compulsory process for obtaining Witnesses in [their] favor."

▆ It has long been settled in this Circuit that the prosecution's suppression, concealment, or failure to disclose evidence it has discovered which is useful to the defense constitutes a denial of due process of law. United States ex rel. Almeida v. Baldi, 195 F.2d 815, 33 A.L.R. 2d 1407 (C.A.3, 1952), cert. den. 345 U.S. 904, 73 S.Ct. 639, 97 L.Ed. 1341 (1953),

reh. den. 345 U.S. 946, 73 S.Ct. 828, 97 L.Ed. 1371 (1953); United States ex rel. Thompson v. Dye, 221 F.2d 763 (C.A.3, 1955), cert. den. sub nom. Pennsylvania v. United States ex rel. Thompson, 350 U.S. 875, 76 S.Ct. 120, 100 L.Ed. 773 (1955). This view was specifically approved by the United States Supreme Court in Brady v. Maryland, 373 U.S. 83, 86, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady* the Supreme Court overturned the conviction of a defendant whose attorney was refused access to a statement tending to exculpate the defendant after the attorney had requested the statement. In its opinion the Court stated:

"We now hold that the suppression by the prosecution of evidence favorable to an accused *upon request* violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." (Emphasis supplied). 373 U.S. at 87, 83 S.Ct. at 1196.

 A formal request of the prosecution is not necessary under *Brady* where the prosecution fails to disclose the *existence* of a witness important to the defense. United States ex rel. Meers v. Wilkins, 326 F.2d 135 (C.A.2, 1964); Lee v. United States, 388 F.2d 737 (C.A.9, 1968). However, the present case does not involve the failure of the government to disclose the existence of, the name of, or the whereabouts of a witness. In fact, Sexton was interviewed in Canada by one of the defense counsel, with travel and lodging expenses paid by the government.

 It has been held that the mere fact that an American court lacks the power to subpoena witnesses, other than American citizens, from foreign countries, thus preventing a defendant from obtaining compulsory process for witnesses in his behalf, does not make any resulting conviction unconstitutional under the Sixth Amendment. United States v. Haim, 218 F.Supp. 922, 925–927 (S.D.N.Y.1963); United States v. Greco, 298 F.2d 247, 251 (C.A.2, 1962), cert. den. 369 U.S. 820, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962).[19] The government is under no duty to search for witnesses desired by the defense. Ferrari v. United States, 244 F.2d 132, 141–142 (C.A.9, 1957), cert. den. sub nom. Cherpakov v. United States, 355 U.S. 873, 78 S.Ct. 124, 2 L.Ed.2d 78 (1957); United States v. Di Gregorio, 148 F.Supp. 526, 528 (S.D. N.Y.1957).[20] However, it is clear that the Sixth Amendment's right to compulsory process is violated by the prosecution deliberately sending a witness beyond the jurisdictional reach of a court's compulsory process. People v. Wilson, 24 Ill.2d 425, 182 N.E.2d 203 (1962); People v. Williams, 40 Ill.2d 367, 240 N. E.2d 580 (1968).

The defendants do not claim that the government deliberately sent Sexton back to Canada to prevent him from testifying. Instead, a more subtle issue is raised by the defendants' charge that the prosecution's concealment from them of any knowledge of Sexton's presence in Delaware denied them their Sixth Amendment right to compulsory process. Presumably had the defendants known of Sexton's presence in Delaware, just down the corridor from the clerk's office, they could have served him with process compelling him to appear in

19. Nor does the disappearance of a witness, preventing compulsory process being served on him, automatically create a violation of the defendant's right to compulsory process. United States v. Makekau, 429 F.2d 1403 (C.A.9, 1970), cert. den. 400 U.S. 904, 91 S.Ct. 143, 27 L.Ed.2d 141 (1970).

20. In Gillars v. United States, 87 U.S. App.D.C. 16, 182 F.2d 962 (1950) the defendant in a criminal case had requested subpoenas to be issued for witnesses residing in Germany. Because of the territorial limitation of American judicial powers, this request had to be denied. However, since the government had transported all of the witnesses to the United States, the D. C. Circuit Court, on appeal, held that no violation of the right to compulsory process had occurred. See also Burgman v. United States, 88 U.S.App.D.C. 184, 188 F.2d 637 (1951), cert. den. 342 U.S. 838, 72 S.Ct. 64, 96 L.Ed. 634 (1951).

their behalf. The defendants' lack of knowledge, not occasioned by any bad faith on the part of the prosecution, prevented this.

▮ While a criminal defendant has an absolute right to Sixth Amendment compulsory process, it is the opinion of this Court that two things must be shown, in the situation here presented, before a denial of this right can be found. *First*, there must be a showing (a) that the potential witness is competent to testify and (b) that he possesses material, relevant evidence having some tendency to aid the defendant's case. See Thompson v. United States, 372 F.2d 826, 828 (C.A.5, 1967). *Second*, there must be a showing (a) that some effort was made to obtain the appearance of the witness or that an attempt has been made to obtain the evidence of the witness by deposition or otherwise and (b) that some notice was given to the prosecution or that the prosecution was, in fact, aware of the defendant's need for the witness, or that steps were not taken to obtain the witness's appearance because the prosecution, by promises or assurances, lulled the defense into believing that such actions were unnecessary because the witness would be made available to the defense. See Ellhamer v. Wilson, 312 F.Supp. 1245, 1250–1251 (N.D.Cal.1969); Cf. Lamb v. United States, 414 F.2d 250, 251–252 (C.A.9, 1969).

▮ The defendants in this case have failed to show that they meet the first requirement. The post-trial affidavit of United States Attorney Stone (attached to Paper # 129) indicates that Sexton had little or no recollection of the April 14, 1966 meeting. The post-trial affidavit of defense counsel, Donald C. Taylor, counsel for defendant Wolfson (Paper # 146), filed at the Court's request, mentions nothing about any testimony Sexton could have given relative

to this meeting or any other event involved in this case.[21] Therefore it can be concluded that Sexton would not have been competent to testify as to the facts in this case and could not have given material, relevant evidence on behalf of the defendants.

However, even assuming that Sexton would have been a competent witness and could have given material and relevant testimony, the defendants have failed to meet the second requirement. The defendants do not contend that they gave any explicit notice to the prosecution of their need for Sexton nor do they contend that the prosecution was at any time requested to assist in getting Sexton to testify. The record is completely devoid of any indication that the prosecution was afforded actual notice of the defendants' need for Sexton.

It was asserted in the affidavit of defense counsel Taylor that the defense relied on a letter written to them by United States Attorney Stone which stated that Sexton would appear as a witness. (See letter attached to Paper # 146). Such reliance, however, is difficult to detect from the record.

On November 13, 1969 at a conference in chambers Taylor asked the prosecution point blank if Sexton was going to be brought down as a witness and L. Vincent Ramunno, the Special Assistant United States Attorney, one of the prosecutors, said "No. He is not going to be called as a witness." (Tr., p. 1097). Taylor then asked if any expert on Canadian law was going to be put on by the government. Mr. Stone answered in the negative.

Neither Taylor nor any other defense counsel raised any objection or made any demand upon the government for Sexton to be brought down from Canada, nor was any request for an adjournment or continuance or for a mistrial to be de-

---

21. The only testimony which Sexton might have been competent to have given would have been expert testimony on Canadian law, according to the Taylor affidavit. Because Canadian law has been found to have been irrelevant to this case, Sexton's ability to have given testimony on the issue is also irrelevant. See this opinion *infra*.

clared made at the time.[22] Cf. Thomas v. United States, 343 F.2d 49 (C.A.9, 1965); Lamb v. United States, supra. The trial continued for another nine days with no objection or request for Sexton's presence being made by the defendants or any of their counsel. In fact, no showing has been made that the defense ever made any effort to get Sexton to voluntarily appear and testify.

However, the defendants have contended that the government should have known of Sexton's value to them and that certain references to Sexton in the record put the government on notice that Sexton's presence was desired by the defendants. This was reiterated in defense counsel Taylor's affidavit. Therefore, the trial record must be examined closely to ascertain whether the prosecution should have been on notice that the defendants desired to obtain Sexton's testimony.

The first mention of Sexton's name came in the direct examination of George Arthur Cooper, the managing director of Agents General. Cooper identified Sexton as being one of ten persons present at a meeting held on April 14, 1966 in the office of the Superintendent of Insurance for the Province of Ontario. (Tr., p. 160). At that time nothing further was brought out about Sexton. In the cross examination of Cooper the following transpired between Cooper and Taylor, counsel for defendant Wolfson:

"Q. Did the Insurance Superintendent's office in Toronto ever tell you that it was ill-conceived?

"A. Not to my recollection.

"Q. I believe one of the witnesses that will be here by the Government is an officer or an official of the Insurance Commissioner's office. If I told you that, when I interviewed him in Canada, he said the company was ill-conceived and you had been advised, would that refresh your memory at all?

"A. No, it wouldn't." (Tr., pp. 186–187).

The defendants rely on this exchange to establish that they were depending on Sexton being available as a witness who could be used by them. However, at no time was Sexton specifically referred to by name, nor was it ever made clear that Sexton was the only witness Taylor interviewed who met the description given. It appears to the Court that this vague reference, made during a long cross-examination, would scarcely constitute a positive declaration that Sexton was considered by the defendants to be a vital witness for them. This is made even clearer by an exchange which occurred later in Taylor's cross-examination of Cooper when the following occurred:

"Q. And isn't it true that the insurance Commissioner's office wanted the first contract cancelled?

"A. Yes.

"Q. And isn't it true that he wanted it cancelled before the second contract was even entered into?

"A. No.

"Q. Is that not true?

"A. That is not true.

"Q. All right, sir. Well, we will discuss that with Mr. Silver." (Tr., p. 241).

From this it could be inferred that Silver, who was the Commissioner, not Sexton, his deputy, was the witness from the Insurance Commissioner's office referred to earlier. At least the record is unclear. Therefore, it seems obvious that the statement made in Taylor's cross-examination of Cooper did not constitute notice to the government that Sexton was needed by the defense.

During discussions in chambers on Friday, November 21, 1969, Taylor com-

22. Nor did the defendants move to take Sexton's deposition in Canada under Rule 15, F.R.Crim.P. See Young Bark Yau v. United States, 33 F.2d 236 (C.A.9, 1929); United States v. Dockery, 50 F.Supp. 410 (E.D.N.Y.1943).

plained about Sexton's absence. This is the first time there is an indication in the record that the defendants might have wanted Sexton as a witness.[23] The following exchange occurred in chambers:

"Mr. Taylor: I am not sure we would be here on a writ if Mr. Sexton had come down from Canada either. And this was in the reach of the Government to be able to produce and certainly not within the power of the Defendants to take care of, and I think the Government has a burden there.

"Mr. Ramunno: Did you attempt to have Mr. Sexton come down on your behalf?

"Mr. Taylor: I talked to him myself when I was in Canada.

"The Court: Well, regardless of that, he wasn't here." (Tr., p. 1380)

Taylor did not then request the assistance of either the prosecution or the Court to obtain Sexton nor was any further protest made because Sexton had not been produced. It appears to this Court that the failure of the defense counsel to make any request of either the government or the Court to assist in getting Sexton to testify or to plainly indicate that Sexton's nonappearance would prejudice the defendants' case clearly demonstrates that this issue is a mere afterthought and that there was no actual violation of the defendants' right to compulsory process.

■■■ The defendants have also claimed that the government's failure to call Sexton as a prosecution witness was prejudicial error. This claim is without merit. It has long been held that the government is not required to call every witness who might be able to give some evidence about the crime. Curtis v. Rives, 75 U.S.App.D.C. 66, 123 F.2d 936, 940 (1941); Morton v. United States, 79 U.S.App.D.C. 329, 147 F.2d 28, 31 (1945), cert. den. 324 U.S. 875, 65 S.Ct. 1015, 89 L.Ed. 1428 (1945); Deaver v. United States, 81 U.S.App.D.C. 148, 155 F.2d 740, 744 (1946), cert. den. 329 U.S. 766, 67 S.Ct. 121, 91 L.Ed. 659 (1946); Zammar v. United States, 217 F.2d 223, 225–226 (C.A. 8, 1954); Ferrari v. United States, supra, 244 F.2d at 141–142. The failure to call Sexton as a witness did not constitute error.

E. *Admission of Inadmissible Evidence*

■■■ The defendants contend that they were denied their Sixth Amendment right of confrontation of witnesses by the admission of hearsay testimony prejudicial to them and that they were denied their right to a fair trial by the improper admission of irrelevant, prejudicial, and hearsay evidence. At the outset it should be noted that the United States Supreme Court has quite clearly indicated that the Sixth Amendment right of confrontation cannot be construed as merely codifying the hearsay rule and its recognized exceptions. California v. Green, 399 U.S. 149, 155, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). Therefore it would seem to logically follow that the mere admission of hearsay evidence which should not have been admitted, does not automatically entitle a criminal defendant to a new trial. Absent a Constitutional violation, only when evidence erroneously admitted is very substantial, irrelevant and prejudicial should a new trial be granted on this ground. Cf. United States v. Lippi, 190 F.Supp. 604, 607 (D.Del.1961), reconsid. den. 193 F.Supp. 441 (D.Del.1961); Leahy v. United States, 272 F.2d 487, 488 (C.A. 9, 1959), cert. dismissed 364 U.S. 945, 81 S.Ct. 465, 5 L.Ed.2d 459 (1961).

The defendants contend that the testimony of Wilbur J. Lizza, the general manager of Keystone Fireworks Manufacturing Company, as to certain claims

23. Apparently the defense counsel were referring to Sexton's appearance as an expert witness on Canadian law and not as a witness as to the facts. Canadian law has been found irrelevant to the case. See this opinion *infra*.

alleged to have arisen under his Agents General policy, sold to him by Jenness, was inadmissible hearsay, highly prejudicial to them. Lizza's testimony concerned claims which his company was notified about, involving injuries alleged to have been suffered in Michigan and Virginia. (Tr., pp. 862–863; 873–874). Lizza stated that he reported the claims to Jenness. (Tr., p. 861). Jenness testified that he received information of the claims which he forwarded to the defendants. (Tr., pp. 617–621). To support this, a letter from Jenness relative to the claims was put into evidence. (GX–38). Several letters from Insurance Reporting Service, Inc. to Lizza requesting the payment of deductible amounts were put into evidence without any objection germane to the present question.[24] (GX–68, 60, 62, 64 and 66). In addition checks sent by Lizza to Insurance Reporting Service, Inc. (GX–59,[25] 61, 65, and 67) were placed in evidence without objection.

This evidence was relevant to prove the existence of one element of the scheme set forth in the indictment, the collection of deductible amounts (¶ 24). None of the evidence adduced was inadmissible hearsay because only the fact that the claims had been made was being proved, not the truth or validity of the claims themselves. In addition, no objections on this ground were made to the admission of the evidence.

The remainder of Lizza's testimony was punctuated with hearsay and relevancy objections. (Tr., pp. 912–924). Three letters written by Lizza and mailed to Insurance Reporting Service, Inc. were admitted over defendants' objections. (GX–68, 69, 70). The letters were authenticated and shown by proper evidence to have been mailed, but they were never shown to have been admissible under any exception to the hearsay rule.[26]

The letters themselves were written by Lizza, the witness on the stand at the time of their admission. Therefore it is obvious that the admission of the letters themselves, in so far as they were hearsay declarations of Lizza, did not violate the defendants' right to confrontation. California v. Green, supra. Cross-examination brought out Lizza's lack of personal knowledge as to the validity of the claims. (Tr., pp. 932–933). The admission of the letters themselves for the limited purpose for which they were admitted was not error.

As to the hearsay declarations contained in the letters, one stated " * * * I understand the Safeway Pyro Company has received a letter from their attorney," (GX–68). This was the only identifiable hearsay declaration contained in the body of any of the letters. Any allegation of prejudice to the defendants based upon the admission of this statement would be obviously absurd.

The defendants also assert that the admission of the testimony of Mrs. Sarah L. Shear was improperly allowed. (Tr., pp. 1122–1132). However, the Court sustained all objections to admitting the policy she purportedly had purchased. (Tr., pp. 1124–1128). The only testimony which the witness gave was concerning a claim which had supposedly arisen under this policy. Since the only objection made was to the materiality of the testimony (Tr., p. 1130), any other objections were waived. Because failure to settle claims was alleged (¶ 23), the testimony was not immaterial. In addition, it should be noted that a defense counsel's cross-examination elicited the admission that the witness

---

24. Objection was made only as to the use of the letters, to establish venue or jurisdiction in the District of Delaware. The authenticity of the letters themselves was not questioned. (Tr., p. 866).

25. GX–59 has been found by this Court, supra, in this opinion, to have been sufficient to sustain Count 7 because proper mailing of the check was proved.

26. Proof of the receipt of GX–70 was proper because it related to Count 8 of the indictment. Since Count 8 involved defendant Thompson only, his acquittal removed this issue from consideration.

had no personal knowledge that anyone other than her own agent was informed of the claim. (Tr., p. 1133). Therefore the Court finds no grounds for granting the defendants a new trial based upon the admission of this testimony.

Error is also alleged to have occurred in the admission of certain testimony of Arthur P. Reeher pertaining to the disposition of the Buckhorn salvage check. The defendants contention that Reeher's testimony relating to the forwarding of the check to defendant Thompson (Tr., p. 1020) was not tied in to other evidence is without merit since, contrary to the statement in their brief, the policy was introduced into evidence, as GX–78. Further, the linking through other evidence of defendants Wolfson and Emmons with the policy involved was, in the opinion of the Court, sufficient to tie this in. (See Tr., pp. 335, 346, 360, 365). Therefore the admission of this testimony does not warrant the granting of a new trial.

■■■ Other errors in the admission of evidence have been alleged. The defendants contend that the admission of testimony by Crandall Ayers, a former employee of Excess, was improper. (Tr., pp. 828–839). The witness's testimony was of some, albeit slight, probative value in establishing a connection between Wolfson, Emmons, and Excess and the use of 2008 Pennsylvania Avenue as an office. (Tr., pp. 829–831). However, even if the testimony was in fact immaterial or irrelevant its admission

was not prejudicial. The only testimony of the witness was that he had been sent to the bank on several occasions to cash checks. (Tr., pp. 831–835). Thus the defendants' contentions as to this testimony are totally lacking in merit.

■■■ The only remaining contention of the defendants relative to the evidence at trial is the argument that copies of Agents General cover notes which did not contain all the policy endorsements attached were improperly admitted under the Federal Business Records Act, 28 U.S.C. § 1732.[27] However, this statute, designed to codify and expand the common law "business records" exception to the hearsay rule, was not applicable as to these policies since the policies were not admitted for the truth of their contents but only to show their issuance and existence. Not being hearsay, no problem was presented as to their admission regardless of whether or not the contents may have fallen under an exception to the hearsay rule, common law or statutory.[28] The admission of the cover notes did not violate the Business Records Act and does not provide grounds to set aside the verdict and grant the defendants a new trial.

### F. Prosecutor's Argument To The Jury

The defendants claim that they were prejudiced by the United States Attorney's characterization of them as "crooks", "viruses", and "germs", par-

27. The Business Records Act does not dispense with the necessity of authentication. William Whitman Co. v. Universal Oil Products Co., 125 F.Supp. 137, 145 (D.Del.1954).

28. It has been held that in order for a document to be admissible under the Business Records Act it must be a business record prepared in the ordinary course of business by the company in whose files it is found. Phillips v. United States, 356 F.2d 297, 307 (C.A.9, 1965), cert. den. sub nom. Walker v. United States, 384 U.S. 952, 86 S.Ct. 1573, 16 L.Ed.2d 548 (1966); Cromling v. Pittsburgh &

Lake Erie R. Co., 327 F.2d 142, 147 (C.A.3, 1963). Therefore it would appear that the cover note copies, purportedly prepared by the defendants or their employees, which were carbon file copies retained by the insurance agents would not be admissible because of this Act. However, the cover notes which were purportedly prepared by the defendants or their employees would be admissible under the "party admissions" exception to the hearsay rule. See Schine Chain Theaters, Inc. v. United States, 334 U.S. 110, 116–117, 68 S.Ct. 947, 92 L.Ed. 1245 (1948).

ticularly in his closing argument.[29] In his opening argument United States Attorney Stone referred to the defendants as "crooks" and "criminals." (Tr., p. 37). At the very end of his closing argument he said,

"Now I am going to close in a moment, but I just want to make a couple general remarks, and in a sense echo what I told you at the outset. We are dealing with a white collar crime case. This is not like some criminal cases that you may have served on as jurors, such as robbery or burglary, some kind of street crime. I suggest to you that the criminal intent involved, the election made in the minds of the Defendants, was the same as in any criminal case. Actually, the robber or the burglar would be an insurance con man if he could. It is more profitable; it is easier, and there is less chance of detection. But the mental election to succeed through criminal means is the same for a robber or a swindler.

"Now I told you that these Defendants that are before the bar today are no ordinary business men, and with some care and some deliberation I referred to them as *crooks* because I think that's a very expressive term. And I recognized at the outset and I told you, that I was obliged to back up the facts that I told you in the opening statement. I am telling you now that I am obliged to base my closing remarks on facts adduced. I said they were *crooks*. I think we have proven they were *crooks*, and we have shown this, I believe, beyond a reasonable doubt within the context of the indictment which charges a mail fraud, conspiracy and a series of substantive mail frauds.

"Now, the white collar criminal is an insidious disease of the business community. The reason it is insidious is because it is very difficult to detect

the *virus*. And I liken it to a *virus* because once detected, it even becomes difficult to isolate. And once this virus is isolated, it is often difficult to effect a viral cure. Fortunately in this instance that we are trying before you today we have been successful in detecting, and isolating, *two dangerous viruses* of the insurance business, and we brought them before you for examination. And I hasten to add I don't believe you are going to need a microscope to make this examination.

"One of the *germs*—if I could use that phrase metaphorically—Mr. Nathan Wolfson, and the other, Mr. William Emmons, like the fight against polio, for example, they took a tremendous effort by the postal authorities to bring us to this point where we have these people here for you to examine, for you to examine their conduct and make your determination under the indictment. I believe that the day of reckoning has arrived for this particular insurance malady as perpetrated by *these two viruses,* and we hope—and I would hasten to add, expect—you, the ladies and gentlemen of the jury, will provide the cure. And the cure that I suggest, the effective cure in this case, is a verdict of guilty as to all counts with respect to each Defendant." [Emphasis added]. (Tr., pp. 1551–1553).

Except for this brief discourse the rest of his closing, as well as the closing of Mr. Ramunno, consisted of a review of the evidence presented by the prosecution.

 A United States Attorney's improper argument to a jury is grounds to set aside a conviction only "where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." Berger v. United States, 295 U.S. 78, 89, 55 S.Ct. 629, 633,

29. The closing argument objected to was the rebuttal closing delivered by United States Attorney Stone. No error has been asserted as to the principal closing argument by Special Assistant United States Attorney Ramunno.

79 L.Ed. 1314 (1935). Mere "incidental statements" made in closing argument by a prosecutor after a long trial do not constitute prejudicial error. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). In order to justify setting a conviction aside the argument must be "so offensive as to deprive the defendant of a fair trial," Isaacs v. United States, 301 F.2d 706, 736 (C.A.8, 1962), cert. den. 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962), or it must be "part of a persistent and calculated attack on the character of the defendant, * * *" United States v. Barbone, 283 F.2d 628, 632 (C.A.3, 1960), cert. dismissed 365 U.S. 805, 81 S.Ct. 686, 5 L.Ed.2d 688 (1961).

Over the years prosecuting attorneys have employed almost every conceivable sobriquet in referring to a criminal defendant, and escaped reversal. In this Circuit it has been held not prejudicial for the prosecutor to say in closing that defendants who operated an illicit whiskey still were "not Sunday School people." United States v. Barbone, supra, 283 F.2d at 632. Prosecutors in other parts of the country have not been so restrained. Among the more colorful references which courts have allowed are "panderer," [30] "pimp," [31] "leech," [32] "human vulture," [33] "wolf from Wall Street," [34] "barroom bully," [35] "big ape," [36] "king of bootleggers," [37] "gorilla," [38] "partner in crime," [39] "malefactor of great wealth," [40] "Dr. Jekyll and Mr. Hyde," [41] "financial baron," [42] "pathological liar," [43] "gambler," [44] "burglar," [45] "living fraud," [46] "sneak thief in the night," [47] "living lie," [48] "trafficker in human misery," [49] "liar," [50] "type of worm," [51] "wheeler and deal-

[30]. Patterson v. United States, 361 F.2d 632, 636 (C.A.8, 1966).

[31]. United States v. Cohen, 177 F.2d 523, 525–526 (C.A.2, 1949), cert. den. 339 U.S. 914, 70 S.Ct. 568, 94 L.Ed. 1340 (1950), reh. den. 339 U.S. 936, 70 S.Ct. 664, 94 L.Ed. 1354 (1950); Patterson v. United States, supra.

[32]. United States v. Guidarelli, 318 F.2d 523, 525 (C.A.2, 1963), cert. den. 375 U.S. 828, 84 S.Ct. 72, 11 L.Ed.2d 60 (1963).

[33]. Kowalchuk v. United States, 176 F.2d 873, 877 (C.A.6, 1949).

[34]. United States v. Goodman, 110 F.2d 390, 394 (C.A.7, 1940).

[35]. United States v. Pickens, 148 F.Supp. 652, 657, 16 Alaska 679 (D.Alaska 1957) aff'd. 261 F.2d 438 (C.A.9, 1958).

[36]. Downie v. Burke, 408 F.2d 343, 344 (C.A.7, 1969), cert. den. 395 U.S. 940, 89 S.Ct. 2011, 23 L.Ed.2d 457 (1969).

[37]. Lau v. United States, 13 F.2d 975, 976 (C.A.8, 1926), cert. den. 273 U.S. 739, 47 S.Ct. 332, 71 L.Ed. 867 (1927).

[38]. Downie v. Burke, supra.

[39]. Mellor v. United States, 160 F.2d 757, 765 (C.A.8, 1947), cert. den. 331 U.S. 848, 67 S.Ct. 1734, 91 L.Ed. 1858 (1947).

[40]. United States v. Socony-Vacuum Oil Co., supra, 310 U.S. at 238, 60 S.Ct. 811.

[41]. Steele v. United States, 222 F.2d 628, 631 (C.A.5, 1955), cert. den. 355 U.S. 828, 78 S.Ct. 39, 2 L.Ed.2d 41 (1957), reh. den. 355 U.S. 875, 78 S.Ct. 115, 2 L.Ed.2d 79 (1957).

[42]. United States v. Redfield, 197 F.Supp. 559, 589 (D.Nev.1961), aff'd. 295 F.2d 249 (C.A.9, 1961), cert. den. 369 U.S. 803, 82 S.Ct. 642, 7 L.Ed.2d 550 (1962).

[43]. Isaacs v. United States, 301 F.2d 706, 737 (C.A.8, 1962), cert. den. 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962).

[44]. United States v. Gerone, 150 F.2d 382, 385 (C.A.7, 1945), cert. den. 326 U.S. 756, 66 S.Ct. 98, 90 L.Ed. 454 (1945).

[45]. United States v. Stead, 422 F.2d 183, 184 (C.A.8, 1970), cert. den. 397 U.S. 1080, 90 S.Ct. 1534, 25 L.Ed.2d 816 (1970).

[46]. Herman v. United States, 220 F.2d 219, 225 (C.A.4, 1955), cert. den. 350 U.S. 971, 76 S.Ct. 444, 100 L.Ed. 843 (1956).

[47]. United States v. Stead, supra.

[48]. Herman v. United States, supra.

[49]. United States v. Markham, 191 F.2d 936, 939 (C.A.7, 1951).

[50]. United States v. Hoffman, 415 F.2d 14, 21 (C.A.7, 1969), cert. den. 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 423 (1969).

[51]. United States v. Walker, 190 F.2d 481, 484 (C.A.2, 1951), cert. den. 342 U.S. 868, 72 S.Ct. 109, 96 L.Ed. 653 (1951), reh. den. 342 U.S. 899, 72 S.Ct. 229, 96 L.Ed. 673 (1951).

er," [52] "phoney," [53] "crook," [54] and "natural son of an unnatural father." [55]

Very few cases have held epithets of a prosecutor improper enough to cause the conviction to be set aside. In Volkmor v. United States, 13 F.2d 594, 595 (C.A.6, 1926) the Assistant United States Attorney called the defendant a "skunk," a "weak-faced weasel," and a "cheap, scaly, slimy crook" in his closing argument over the repeated objections of defense counsel. The Court, on appeal, held that the error was so serious that it likely affected the minds of the jury. For this reason the Court set aside the conviction.

 In the present case no objection was made by defense counsel to the statements made in the closing argument. When improper remarks are made by a prosecutor in closing argument to the jury, prompt objection should be made by defense counsel. United States v. Elmore, 423 F.2d 775, 781 (C.A.4, 1970), cert. den. 400 U.S. 825, 91 S.Ct. 49, 27 L.Ed.2d 54 (1970); Birnbaum v. United States, 356 F.2d 856, 866 (C.A.8, 1966). Only where the closing argument of a prosecutor is so inflammatory and prejudicial that it constitutes a denial of a fair trial to the defendant should the trial judge stop the argument, *sua sponte*. Viereck v. United States, 318 U.S. 236, 247–248, 63 S.Ct. 561, 87 L.Ed. 734 (1943).

In Getchell v. United States, 282 F.2d 681 (C.A.5, 1960), reh. den. 283 F.2d 695 (C.A.5, 1960), the Fifth Circuit Court of Appeals reversed the convictions of defendants convicted of mail fraud because of the prosecutor's numerous references to one or the other of the defendants during his closing argument as a "con man," a "marker," a "mooch," a "senior con man," or the like, even though no objection was made by defense counsel. However, for several reasons this Court does not believe *Getchell* is persuasive authority for setting aside

the verdict in the present case. In *Getchell* very slight evidence of guilt was produced. Also, certain highly prejudicial evidence had been erroneously admitted by the trial court. In addition, it appears that such remarks permeated the entire closing and were not, as in the present case, only a brief excursion from a fair, factual presentation of the facts. This Court also notes the vigorous dissent by Judge Tuttle in which he pointed out and analyzed the numerous grounds asserted by the majority in support of its reversal.

In United States v. Sprengel, 103 F.2d 876 (C.A.3, 1939) the Third Circuit Court of Appeals in an opinion by Judge Biggs reversed a mail fraud conviction of several defendants on grounds which included the fact that the prosecutor in his closing said, "We have got to convict these people. They will go wild with this kind of thing. The only way it can be done is by conviction." 103 F.2d at 884. However, in that case the erroneous admission of highly prejudicial testimony was the chief basis cited for the reversal. The improper closing of the prosecuting attorney was only briefly alluded to in the opinion. For this reason, *Sprengel* is distinguishable from the present case.

 Examining the record in the present case, this Court does not find that the brief references made to the defendants as "crooks," "viruses," or "germs," were sufficiently prejudicial under the prevailing judicial standards to require the convictions to be set aside on this ground. The government's principal closing, delivered by Special Assistant United States Attorney Ramunno, lasted approximately an hour and a half without containing any objectionable characterizations. United States Attorney Stone's rebuttal lasted forty-five minutes. The Court remembers the summation, the manner and tone in which it was given and clearly recalls that the ob-

---

52. United States v. Hoffman, supra.

53. United States v. Walker, supra.

54. United States v. Hoffman, supra; United States v. Walker, supra.

55. United States v. Walker, supra.

jectionable references were casually and quickly made and were an insignificant part of the government's argument. For the Court to have ordered the comments stricken *sua sponte* would have called more attention to them and placed more emphasis on them than they were given at the trial. It is obvious from the transcript that there was no conscious, deliberate attempt on the part of the prosecution to malign the defendants' character, that the remarks were not so patently offensive as to prejudice the jury, and that the comments were only an incidental part of the closing argument and do not rise to the level of prejudicial error. "[S]ome latitude must be given to lawyers' language in a hard fought case." United States v. Kravitz, 281 F.2d 581, 586 (C.A.3, 1960), cert. den. 364 U.S. 941, 81 S.Ct. 459, 5 L.Ed.2d 372 (1961).

However, the Court does not condone the use of derogatory and disparaging sobriquets in reference to the defendants during summation. A United States Attorney should refrain from any name calling. "His case must rest on evidence, not epithet. If his case is a sound one his evidence is enough; if it is not sound, he should not resort to epithet to give it a false appearance of strength." United States v. Kravitz, supra, 281 F.2d at 587. In the present case, however, the Court finds no error requiring the verdict to be set aside on this ground.

### G. *Failure To Instruct The Jury On Canadian Law*

The defendants argue that they were denied a fair trial because the Court refused to give several jury instructions requested by them concerning Canadian insurance law. (Paper # 117; see Tr., p. 1377).

The Court gave the following instruction:

> "I wish to instruct you concerning the significance of Canadian law, and the limited purpose for which you should consider Canadian law in this case. The defendants of course are not charged with the violation of Canadian law, but with the violations of laws of the United States, as I have previously instructed you. The basic nature of the offense with which the defendants are charged in both the conspiracy and substantive counts of the indictment is entering into a scheme or agreement to defraud. Establishing a scheme to defraud requires proof beyond a reasonable doubt that the defendants entered into the scheme or conspiracy with the specific intent to defraud. In regard to this specific intent to defraud, the good faith belief of the defendants as to the propriety of their actions is a complete defense to the offenses charged.

> "Therefore, with respect to the question whether the defendants acted with an intent to defraud, you may consider the defendants knowledge of the law of Canada and their opinion as to the applicability of this law to the conduct in which they were engaged, or planned to engage. The government has alleged that it was part of the scheme to defraud, entered into by the defendants, that Canadian and British would sell insurance on behalf of Agents General without obtaining authorization of the Superintendent of Insurance of the Province of Ontario; also to sell insurance with coverage in excess of the limits authorized and to sell insurance for risks Agents General was not authorized to write. If you find that the defendants, however, entertained a good faith belief that it was not necessary to obtain the approval of the Insurance Superintendent, that the coverage and types of risks were not limited by the Insurance Commissioner, or in good faith, did not know of any such alleged applicable requirements of the Ontario Insurance Commissioner, then such belief or lack of knowledge would constitute a complete defense to the charges of fraud based on the sale of insurance without obtaining prior authorization, or based on the amounts or types of insurance to be sold."

(Paper # 119, p. 13; Tr., pp. 1382–1384; Tr., pp. 1567–1568).

The defendants had requested that the jury be instructed that Canadian law did not require permission to be obtained from the Superintendent of Insurance for the Province of Ontario before Agents General could write insurance in the United States, that Canadian law did not authorize the Superintendent to restrict an insurance company's license, and that under Canadian law "products liability" insurance was included as part of "public liability" insurance. (Paper # 117; see Tr., p. 1377). The Court refused to give the defendants' instruction because the law had not been proven to the Court's satisfaction and because the Court held Canadian law to be irrelevant except as outlined in the instruction given.

 Upon further consideration the Court is of the opinion that it was correct in its holding that Canadian insurance law was not relevant. In an early case the United States Supreme Court held that the essence of a mail fraud scheme or artifice is the *intent* of the defendant to defraud. "The significant fact is the intent and purpose." Durland v. United States, 161 U.S. 306, 313, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896). The nature of the offense was explained by the Third Circuit Court of Appeals in Kaufmann v. United States, 282 F. 776, 779 (C.A.3, 1922), cert. den. 260 U.S. 735, 43 S.Ct. 96, 67 L.Ed. 488 (1922), as follows:

"The words 'intending to devise' are the legal scales by which the scheme devised must be weighed. However impractical and visionary a scheme may be, the use of the mails to execute it does not constitute a crime, if it was devised in good faith. On the other hand, if a scheme is devised with the intention of defrauding, and the mails are used in executing it, it makes no difference that there is not a misrepresentation of a single existing fact."

It is not necessary in a mail fraud prosecution to prove that someone was actually defrauded. New England Enterprises, Inc. v. United States, 400 F.2d 58, 72 (C.A.1, 1968), cert. den. 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969). It has been held that "no matter how seemingly fair and honest a scheme may be, if the purpose of the scheme is to defraud, it is within the statute" and thus the operation of a legitimate business, utilizing the mails with fraudulent intent, is covered by the mail fraud statute. McConkey v. United States, 171 F. 829, 832 (C.A.8, 1909).

For example, in Linden v. United States, 254 F.2d 560 (C.A.4, 1958) the Fourth Circuit Court of Appeals upheld the mail fraud conviction of the publisher of a classified business directory who solicited listings in a manner very similar to that used by the telephone company for the yellow page listings. The fact that the directories were actually published and, presumably, the listings were actually made was not held relevant to the charge. (Note Tr., p. 1374).

 Thus the issue in the present case was not whether the defendants violated Canadian law or did not violate Canadian law, but whether they devised or intended to devise a scheme or artifice to defraud and utilized the mails for that purpose. Therefore, whether or not under Canadian insurance law permission was necessary from the Superintendent of Insurance for the Province of Ontario before beginning the sale of Agents General policies in the United States, whether or not authority existed whereby the Superintendent could restrict Agents General's license, and whether or not products liability insurance was included as part of public liability insurance were not significant; only the defendants' beliefs about these were. Even if it could have been shown that every act done by the defendants was, in fact, legal under Canadian insurance law, if they intended to defraud and used the mails to accomplish this purpose, they were still guilty of violating 18 U.S.C. § 1341. The indictment charged the defendants with selling insurance prior to receiving authority from

the Superintendent (¶ 13), with issuing cover notes for risks in excess of allowable limits and on improper types of risks (¶ 20), and with issuing policies after the April 14, 1966 license restriction (¶ 21), all in furtherance of the scheme and artifice to defraud; the defendants were not charged with any violation of Canadian insurance law. Thus the Court finds no error in its instructions to the jury regarding the significance of Canadian law.

Accordingly, for the reasons herein set forth, the defendants' motions for a new trial will be denied.

The defendants' post-trial motions for acquittal as to Counts 4, 5, 6, 10, and 21 will be granted and the defendants' post-trial motions for acquittal as to the remaining counts will be denied.

An order will be entered in accordance with this opinion.